FRANKLIN TITLE & TRUST COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BEN FRANKLIN FIRE INSURANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 51947, 60167, 67804, 67805. Promulgated March 28, 1935.

*Elwood Hamilton, Esq.*, for the petitioners.
*Harold D. Thomas, Esq.*, for the respondent.

OPINION.

MURDOCK: The following table shows the deficiencies determined by the Commissioner:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Franklin Title & Trust Co | 51947 | 1928 | $14,774.19 |
| Do | 60167 | 1929 | 10,761.20 |
| Do | 67805 | 1930 | 15,856.22 |
| Ben Franklin Fire Insurance Co | 67804 | 1930 | 391.01 |

The cases were consolidated. The facts of record were stipulated. There are in controversy three issues, all of which were raised by the petitioners.

One issue relates only to the year 1930. The Franklin Bond & Mortgage Co. owned all of the capital stock of the Ben Franklin Fire Insurance Co. A consolidated return was filed for the year 1930 by certain trustees for the Franklin Bond & Mortgage Co., the Ben Franklin Fire Insurance Co., and the Franklin Title & Trust Co. This return showed that the two latter companies had net income while the mortgage company had a loss. The Commissioner held that the insurance company was taxable separately. The parties are in agreement as to the amount of its taxable income. The record does not show that the Commissioner has not taxed this insurance company under section 204 of the Revenue Act of 1928 and the parties in their argument and presentation of the case seem to assume that he has taxed it under that section. It is only reasonable to believe that he has so taxed it. The mortgage company and the

trust company were subject to tax under section 13 of that act. If the insurance company was subject to the tax imposed by section 204, it can not be included in the same consolidated return with the other corporations, which were subject to the tax imposed by section 13. See sec. 141(e). Cf. *Fire Companies Building Corporation*, 23 B. T. A. 550; affd., 54 Fed. (2d) 488; certiorari denied, 286 U. S. 546; *Travelers Indemnity Co.*, 31 B. T. A. 507. The sole contention of the fire insurance company is that it was in fact not an insurance company taxable under section 204, but was merely an agent for an insurance company and subject to tax under section 13.

The stipulation shows that the Ben Franklin Fire Insurance Co. was organized to insure property against loss or damage from fire and certain other causes, as well as to act as agent for other insurance companies to reinsure its risks in other companies in whole or in part, to reinsure other companies and their risks in whole or in part, to do things which are generally done by fire insurance companies organized under the provisions of the laws of the State of Kentucky, and to do anything needed in the general carrying on of the fire insurance business. The following is quoted from paragraph 13 of the stipulation:

\* \* \* The Ben Franklin Fire Insurance Company *issued* fire insurance policies, all of which were reinsured by the Insurance Company of North America of Philadelphia, Pa., and its income consisted of commissions on said policies and interest on investments. [Italics supplied.]

The fire insurance company argues that it was merely an agent, since it reinsured all of its risks; " it did not have to maintain a reserve "; its income can not be computed under section 204; and its income can be fairly computed under section 13. The statement in the stipulation that the company issued fire insurance policies indicates quite clearly that it was an insurer and primarily liable on the policies which it issued. It was not merely an agent for another company. Reinsurance and the payment of so-called commissions to the original insurer by the reinsurer is not unusual. There is no evidence that it was not required to maintain reserves. The argument that its income can not be computed under section 204 seems vacuous, since its income has been computed to the mutual satisfaction of the parties. Undoubtedly its income, like the income of any other corporation, could be fairly computed under section 13, but since it was an insurance company within the meaning of section 204, it is subject to tax under that section. Cf. *National Capital Insurance Co. of the District of Columbia*, 28 B. T. A. 1079. The Commissioner did not err in excluding from the consolidated return and taxing separately the income of the Ben Franklin Fire Insurance Co. for 1930.

Another issue is whether the Franklin Title & Trust Co. has a right to have its income tax liability for 1929 and 1930 computed upon the basis of a consolidated return in which it would be joined with the Franklin Bond & Mortgage Co. The income of the trust company would be offset by the losses of the mortgage company for these years. A corporation is defined in the revenue act to include an association, and some trusts have been held to be associations taxable as corporations. The petitioner contends that the trust created on February 1, 1925, is an association, is, therefore, a corporation within the meaning of the act, and is a " parent corporation " within the meaning of section 141(d).[1] The Commissioner has held that the Franklin Title & Trust Co. was not entitled to join with any other corporation in filing a consolidated return for 1929 and 1930. He contends that the trust was not an association taxable as a corporation, therefore, it could not be the " parent corporation " and, consequently, there was no " affiliated group." A summary of the stipulated facts relating to this issue appears in the three paragraphs following this one.

A copy of the trust agreement is attached to the stipulation as Exhibit G. It is dated February 1, 1925. The subscribing stockholders of the Franklin Bond & Mortgage Co. (called the mortgage company) and of the Franklin Title & Trust Co. (called the trust company) stated that they were creating the trust estate for the purpose of securing closer cooperation between the mortgage company and the trust company, to further the best interests of the two companies and the stockholders therein. The subscribing stockholders were to assign whatever shares of stock they held in either or both of the companies to five named trustees, who were to hold and manage these shares as a common and indivisible trust fund for the purposes of and in accordance with the trusts provided in the instrument. When shares were thus assigned to the trustees, the latter were to issue to the assignor a " Trustees Participation Certificate " showing the number and kind of shares transferred to the trustees and the number of shares in the trust estate to which the assignor was entitled. The stockholders of the mortgage company were to receive two participation shares for every share of mortgage company stock assigned to the trustees. The stockholders of the trust company were to receive one participation share for each share of

---

[1] (d) *Definition of " affiliated group ".*—As used in this section an " affiliated group " means one or more chains of corporations connected through stock ownership with a common parent corporation if—

(1) At least 95 per centum of the stock of each of the corporations (except the common parent corporation) is owned directly by one or more of the other corporations; and

(2) The common parent corporation owns directly at least 95 per centum of the stock of at least one of the other corporations. * * *

the trust company stock assigned to the trustees. The trustees were not to assume any liability as stockholders. The assignors were not to be relieved of liability as stockholders. The stockholders' liability was to rest upon the participation certificate holders in the proportion which the share of each in the trust estate bore to the entire trust estate. The trustees could not sell or assign the shares which were assigned to them, except to a newly elected director of one or the other of the companies merely for the purpose of qualifying him during his directorship " upon the request of the holders of Participation Certificates sufficient in amount to secure his election." The trust was to continue until the death of the last survivor of the original subscribers and for 21 years thereafter, but it could be terminated on short notice by a vote of three fourths of the certificate holders. Three of the five trustees were designated by the mortgage company stockholders and two by the trust company stockholders. The following, in regard to appointment of trustees, is from paragraph II of the trust instrument:

Those persons who shall at the time constitute the Stockholders of the Mortgage Company, may, at any time, by a writing signed by a majority of them and filed with the Trustees, remove any of the Trustees designated by the Mortgage Company Stockholders; in like manner, those persons who shall at the time constitute the Stockholders of the Trust Company, may, at any time, by a writing signed by a majority of them and filed with the Trustees, remove any of the Trustees designated by the Trust Company Stockholders; provided, however, that such power shall not be exercised within sixty days prior to the annual meetings of the Stockholders of the Mortgage Company and the Trust Company.

Upon the death, removal, resignation, or refusal to act of any Trustee, or if, from any cause, there should be a vacancy in the position of any Trustee, the Trustees shall immediately elect as a successor that person who shall be designated by a writing signed by a majority of those persons who shall at the time, constitute the Stockholders of the Mortgage Company or of the Trust Company, as the case may be, to the end that there shall always be three Trustees appointed on behalf of the Mortgage Company Stockholders, and two Trustees appointed on behalf of the Trust Company Stockholders.

Paragraph IV is entitled "Terms of Trust" and includes the following:

* * * They [the trustees] shall have the right and it shall be their duty, subject only to the limitations herein prescribed, to exercise, in the interest of the holders of Trustee's Participation Certificates, all the powers of management and control over the Mortgage Company and the Trust Company incident to the ownership of the stock transferred to them hereunder. This shall include all corporate functions of shareholders, for any corporate purpose whatever, and shall especially authorize the Trustees to exercise all voting rights and rights of ownership over said stock in the election of directors, or in the discharge of any other corporate function.

Provided, however, that the owner of record on the books of the Trustees, of any Trustee's Participation Certificate, shall have the right, by written directions to the Trustees, given at least five (5) days before the vote is to be cast,

to instruct them how they shall vote, in corporate meetings of either the Mortgage Company or the Trust Company, such proportionate number of shares therein owned by the Trustees as the number of shares represented by the Certificate owned by such person may bear to the total number of shares represented by outstanding Trustee's Participation Certificates.

Paragraph VII is as follows:

### DISTRIBUTION OF DIVIDENDS

The Trustees shall have the right to deposit with the Trust Company any dividends which they shall receive upon the stock of either or both of said institutions, with directions to the institution in which the deposit is made as to the distribution thereof among the holders of Trustees' Participation Certificates. The making of such deposit and giving of such direction shall relieve the Trustees of all further responsibility for such dividends.

The par value of the capital stock outstanding during the years 1928, 1929, and 1930 was $400,000 for the mortgage company and $200,000 for the trust company. Over 95 percent of the stock of each company was assigned to the trustees and was held by them during 1928, 1929, and 1930. The trustees acted during these years in accordance with the trust agreement. " The Trustees received income from dividends on stock of the two Companies held by them during each of the years here involved in the amount of $79,512.00, and disbursed the same to the holders of the Trustees Participation Certificates."

The mortgage company and the trust company had filed a consolidated return for 1928. The trust company, the mortgage company, and the Ben Franklin Fire Insurance Co. filed a consolidated income tax return for 1929 on March 13, 1930. The " Trustees under agreement dated February 1, 1925 " filed a consolidated return for themselves, the mortgage company, the trust company, and the Ben Franklin Fire Insurance Co. as an affiliated group for 1929 on or about June 4, 1931. The items of income and deductions disclosed by the two returns for 1929 were the same, except that in the second return the amount of $79,512 was reported as dividends received from the trust company and the mortgage company, and a deduction for the same amount was taken. The Commissioner held that the taxpayers did not constitute an affiliated group and refused to compute the tax on the basis of a consolidated return. He determined a deficiency in income taxes against the trust company for the year 1929. The " Trustees under agreement dated February 1, 1925 " on March 4, 1931, filed a consolidated income tax return for 1930 for themselves, the trust company, the mortgage company, and the insurance company as an affiliated group. The respondent held that the taxpayers did not constitute an affiliated group and refused to compute the tax on the basis of a consolidated return. He determined a deficiency in income tax against the trust company for 1930.

The contention of the trust company, on its point that it and the mortgage company belonged to an affiliated group during 1929 and 1930, and were entitled to join in a consolidated return for those years, falls completely if the trust created by the instrument dated February 1, 1925, was not an association taxable as a corporation. Not all trusts are to be treated as associations and taxed as corporations. See Supplement E, Revenue Act of 1928, where trusts are taxed as trusts. A trust taxable under the provisions of Supplement E certainly can not be the "parent corporation" of an affiliated group under section 141 (d). Cf. *Roger Morris Realties, Inc.*, 27 B. T. A. 924. A number of cases have been cited by the trust company to show under what circumstances a trust is considered an association taxable as a corporation. It cites *Hecht* v. *Malley*, 265 U. S. 144, in which the Court said that where trustees do not merely collect funds and pay them over, "but are associated together in much the same manner as the directors in a corporation for the purpose of carrying on business enterprises, the trusts are to be deemed associations * * *." Other cases are cited in which the courts and the Board have attempted to state the test to be applied in determining whether a trust is or is not an association. The trust company argues that the trustees under this trust instrument were not merely acting as fiduciaries to collect dividends and disburse them among stockholders, but under *quasi*-corporate form and in the manner of a corporation were organized to carry on a business and were actually engaged in carrying on a business enterprise during the years here involved. Cf. *Investment Trust of Mutual Investment Co.*, 27 B. T. A. 1322; affd., 71 Fed. (2d) 1009; art. 1314, Regulations 74. If this were true the trust would be an association under the decisions cited. It is true that the stockholders of the two separate companies threw their stockholdings into a common pool which formed the trust estate and were given participation certificates in the trust. In this respect the trust bore some resemblance to a corporation. Cf. *Myers, Long & Co.*, 14 B. T. A. 460. However, there is little further similarity between the form of this trust and the form of a corporation or between the manner in which this trust functioned and the manner in which a corporation functions. Cf. *Jackson-Wermich Trust*, 24 B. T. A. 150.

There is a more important circumstance which alone is fatal to the contention of the trust company—this trust was not organized for the purpose of carrying on a business and, during the taxable years, it did not carry on a business, as distinguished from the normal activities of a mere fiduciary. See, for importance of "business" test, *Twin Bell Oil Syndicate* v. *Helvering*, 70 Fed. (2d) 402, affirming on this point 26 B. T. A. 172; *Tyson* v. *Commissioner*, 68 Fed. (2d)

584; certiorari denied, 292 U. S. 657; *Monrovia Oil Co.*, 28 B. T. A. 335. The mortgage company had its own officers and its own board of directors. Thus equipped, it carried on its own business. The same is true of the trust company. The trustees did not "carry on the business" of either of these corporations in any sense of the words quoted. Their rights were derived from the stockholders and were no greater than the rights of stockholders. Indeed, they were not as great as the rights of stockholders, since the stockholders retained certain of their rights, including some relating to election of directors, allowed the trustees to exercise only a part of their rights, and even retained the power to recall some of the privileges thus granted. The trust company relies upon the provision of the trust instrument that the trustees, subject to certain limitations, shall have "powers of management and control over the mortgage company and the trust company incident to the ownership of the stock transferred to them hereunder." But a stockholder, as such, has no power to directly manage or control a corporation, and carries on no business. The same is true of these trustees. This trust is a limited voting trust. The trustees, with certain important exceptions, were permitted to vote the stock according to their own best judgment. They were to receive and disburse such dividends as were declared and paid by the two companies. The trustees were not carrying on a business in the sense necessary to constitute them an association taxable as a corporation. Cf. *Hecht* v. *Malley, supra; Dunbar* v. *Commissioner*, 65 Fed. (2d) 447. The trust was not a "parent corporation" and the trust company and the mortgage company did not belong to an affiliated group during 1929 and 1930.

The conclusion reached above from the reasoning employed makes it unnecessary to consider whether or not a trust taxable as an association could in any event be a parent corporation, whether or not this particular trust "owns directly" the stock of the mortgage company and the trust company as required by section 141 (d) (2), or whether there was an election to file a consolidated return for 1929.

The above decision of the second issue eliminates from the third issue all question of the right of the mortgage company to deduct commissions paid by it in 1929 and 1930 in connection with the sale of its bonds. It is not a petitioner here, and, since it is not entitled to join in a consolidated return with the trust company for those years, obviously its income and deductions can not affect the tax liability of the trust company. The third issue, thus narrowed, is divisible into two questions. One is whether the amount of commissions which the trust company paid to salesmen for selling the mortgage notes which it had secured from mortgagors was deductible in its entirety in the year in which the sales were made

and the commissions paid, as the trust company contends, instead of being deductible pro rata over a five-year period as determined by the Commissioner. The other is whether the commissions paid by the mortgage company in 1928 in connection with the issuance of its own bonds are deductible in their entirety in that year instead of being deductible pro rata over a five-year period as determined by the Commissioner. The stipulated facts relating to the first question in this issue have been briefly summarized in the three paragraphs following this one.

The trust company during the years 1928, 1929, and 1930 was regularly engaged in carrying on the business of making mortgage loans on real estate in Kentucky and Texas and selling the mortgage notes thus obtained. These loans were for terms ranging from 60 to 180 months and were evidenced by notes of the borrower and secured by mortgages of the borrower. Each loan called for payment of monthly installments by the borrower. Each mortgagor on Kentucky mortgages, at the time he gave the notes and mortgages, agreed by written contract to pay the trust company an amount equal to 1 percent per annum on the monthly balances due on the notes and mortgages. The total of the contract payments payable over the period for which the loan was made was set up on the books of the trust company as accrued income at the time the loan was made. The loans on property in Texas were payable in 63 months. At the time such a loan was made, the mortgagor agreed by written contract to pay the trust company an amount equal to 3 percent on the monthly balances. The total of these contract payments over the period for which the loan was made was set up on the books of the trust company as accrued income at the time each loan was made. The trust company collected from the mortgagor the principal, 6 percent interest, and the contract payments as they fell due, and redeemed at maturity the notes executed by the mortgagor. All of the mortgage notes received by the trust company in connection with the above loans were sold to the public, with the payment of principal and interest at 6 percent guaranteed by the trust company and the mortgage company. The money received from the sale of the notes was used to make new loans, which in turn were handled in the same way. The trust company kept its books on an accrual basis.

The trust company, in selling the notes which it obtained from mortgagors, paid commissions to various agents, some of whom were its employees. The net amount of these commissions in each year was as follows:

| | |
|---|---|
| 1928 | $8,803.53 |
| 1929 | 9,796.00 |
| 1930 | 10,169.01 |

The amount thus paid in each year represented an ordinary and necessary expense of carrying on the business of the trust company. The trust company, in each of the respective years, claimed as a deduction the amount paid in that year as commissions. This was in accordance with its bookkeeping method. The Commissioner disallowed the deduction claimed for each year and allowed instead a lesser amount which he explained was amortization of cost of bond issue charged to income over the life of bonds.

The following table shows the amount of notes sold, the amount of loans made, the total gross income, and commissions earned on loans during the three taxable years here involved:

| Year | Notes sold | Loans made | Total gross income | Commissions earned on loans |
|---|---|---|---|---|
| 1928 | $498,300.00 | $639,100.00 | $130,380.96 | $84,212.03 |
| 1929 | 666,200.00 | 688,700.00 | 180,677.94 | 96,724.96 |
| 1930 | 584,900.00 | 630,200.00 | 169,321.62 | 95,106.77 |

The trust company rightly contends that the amount which it paid in each year as commissions on the sale of mortgage notes was an ordinary and necessary expense paid during that taxable year in carrying on its business within the meaning of section 23 (a) of the Revenue Act of 1928.[2] Apparently the parties were under some misapprehension as to just what these commissions were paid for until they came to write the stipulation of facts. The allegations in the petitions describe the commissions as commissions on collateral trust bonds, and the explanations in the deficiency notices indicate that the Commissioner disallowed the deductions believing that they represented commissions paid upon the issuance by the trust company of its own collateral trust bonds. The parties have now stipulated that the commissions were on the sale of mortgage notes which the trust company had obtained from mortgagors; nevertheless, the respondent still contends that the trust company is not entitled to the deductions. He argues that he correctly spread the deduction for the commissions over a five-year period. He relies upon decisions of the Board, such as *Bonded Mortgage Co. of Baltimore*, 27 B. T. A. 965, and cases therein cited on the second point decided, which actually involved discount, commissions, or similar items paid by taxpayers in connection with the issuance of their own bonds. The Board held in those cases that the discount and commissions

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:
(a) *Expenses.*—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *

should be deducted ratably over the definite period of years during which the bonds would be outstanding, because the taxpayer would benefit from the expenditures during all of this period and should not be allowed to offset the expenditures against the income of the single year in which the bonds were issued. The facts in the present case are quite different and the cases cited are not in point. The trust company issued no bonds. It negotiated mortgage loans and, as promptly as possible, sold the mortgage notes which it had thus obtained. It properly accrued, at the time of making each loan, the commission which it was entitled to receive under its contract with the mortgagor, although it would actually receive those commissions over a period of years. *Bonded Mortgage Co. of Baltimore, supra;* affirmed on this point, 70 Fed. (2d) 341. The sale of the mortgage notes was unlike the issuance of bonds and there would be no reason to spread the commission paid in connection with the sale of the mortgage notes over any period of years. Furthermore, since the petitioner was regularly engaged in the business of making such loans and selling the notes, there is in section 23 (a) statutory authority for the deduction of the commissions in the year in which they were paid. Cf. *Bonded Mortgage Co. of Baltimore* v. *Commissioner,* 70 Fed. (2d) 341, reversing on this point *Bonded Mortgage Co. of Baltimore, supra; United States* v. *Anderson,* 269 U. S. 422; *American National Co.* v. *United States,* 274 U. S. 99; *United States* v. *Mitchell,* 271 U. S. 9.

The stipulated facts relating to the second question in the third issue are summarized in this paragraph. The mortgage company was incorporated in 1924 and was regularly engaged in carrying on the business of making mortgage loans on real estate. These loans were payable in 62 equal monthly installments and a final payment of the balance due on principal and interest, which was not always equal to the prior monthly payments. The loans were secured by mortgages and notes which bore interest at 6 percent. The notes were known as first lien notes. Each mortgagor, at the time he received a loan, also executed a subordinate lien note and thereby agreed to pay the mortgage company an amount equal to 3 percent per annum of the face value of the first lien notes. This amount was to be paid in 28 monthly payments during the first 28 months of the loan. The mortgage company kept its books and made its income tax reports on an accrual basis. It accrued as income at the time of making a loan the total amount of the subordinate lien note. The mortgage company deposited with a trustee United States bonds and treasury certificates, cash, and the first lien notes which it received on its mortgages guaranteed as to principal and interest by the Maryland Casualty Co. The mortgage company issued and sold to

the public its 6 percent " first mortgage collateral trust gold bonds " which were guaranteed by the title company as to the payment of principal and interest and were secured by the collateral deposited with the trustee. These bonds " were due at various times ranging from one to fifteen years " and " a fair average of the due date thereof is five years." The mortgage company collected from the mortgagors the monthly payments to be made under the first lien notes and the subordinate lien notes. In case of default, the trustee could fore-close and apply the proceeds first to satisfy the first lien notes and next to satisfy the subordinate lien notes. The mortgage company had " the right to make substitutions for the collateral originally assigned to and deposited with the trustee; to increase or decrease the amount of the collateral, and the amount of the Bonds outstand-ing at any time, provided always that the aggregate principal amount of Bonds outstanding shall not exceed the aggregate principal amount of collateral held by the trustee to secure the payment thereof." The bonds were subject to redemption at any interest payment date at 101 and accrued interest. The mortgage company sold its bonds and the money received therefrom was used to make new loans which, in turn, were handled in the same way. In selling the bonds, it paid commissions to various agents, some of whom were its employees. The mortgage company paid annual premiums to the Maryland Casualty Co. for insuring the collateral trust bonds, trustees' fees, and certain bondholders' taxes, including the Federal income tax withheld at the source. The following table shows the amount of bonds sold, the amount of loans made, the total gross income, the commissions earned on loans, and the commissions paid in the sale of its bonds:

| Year | Bonds sold | Loans made | Total gross income | Commissions earned on loans | Commissions paid on sale of bonds |
| --- | --- | --- | --- | --- | --- |
| 1928 | $2,555,300 | $2,807,250 | $358,646.07 | $255,360.86 | $80,227.89 |
| 1929 | 747,400 | 1,105,350 | 213,739.12 | 111,316.39 | 35,057.15 |
| 1930 | None | 162,200 | 54,665.87 | [1] 12,068.62 | None |

[1] Commissions refunded in 1930 in excess of commissions earned.

The Commissioner has computed the tax liability of the title com-pany and the mortgage company for 1928 on the basis of a con-solidated return. The mortgage company reported a loss of $171,-871.34 on that return. The Commissioner added to income as shown on the return $521.79 representing the disallowance of a deduction for insurance premiums on officers' lives, and $163,616.02 representing commissions on loans which he held represented income in the year the loans were made. The petitioner has not contested the Commissioner's treatment of these two items. The Commissioner also disallowed a

deduction of $80,227.89 because, as the cost of issuing bonds during the year, it represented a deferred charge to income over the life of the bonds, and allowed instead a deduction of one fifth of that amount as amortization of cost of bonds issued in 1928. He determined the net income of the mortgage company for 1928 to be $56,448.78. The entire deficiency in tax was allocated to the title company in accordance with an agreement between the two companies.

The commissions paid on the sale of the mortgage company's bonds in 1928 could be properly accrued and accounted for in more than one way. True income could be clearly reflected by any one of several methods of accrual if that method were adhered to consistently. The Commissioner concedes that the item is deductible at some time, and the only question is whether the Commissioner's action in spreading the expense over a five-year period and allowing the deduction of only one fifth in 1928 must be reversed and the entire amount allowed as a deduction in 1928. A taxpayer borrowing money by issuing its bonds only occasionally could clearly reflect its income only by prorating the expense of each issue over the life of the issue. *Helvering* v. *Union Pacific Railroad Co.*, 293 U. S. 282; *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988; affirmed on this point, 47 Fed. (2d) 990; certiorari denied, 284 U. S. 618; *Kansas City Southern Railway Co.*, 22 B. T. A. 949, 966; affirmed and reversed on other points in 75 Fed. (2d) 786; *Liberty Farms Co.*, 22 B. T. A. 1298. However, a taxpayer issuing its bonds frequently and regularly in the ordinary course of its business, provided its business is the making of mortgage loans having a life commensurate with the life of its bonds, could not only clearly reflect its income by prorating the expenses of each bond issue over the life of those particular bonds, but might also clearly reflect its income if it regularly and consistently treated the expense of issuing its bonds as an expense of the year in which the bonds were sold.

The revenue acts provided, as a general rule, that net income shall be computed " in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." Sec. 42, Revenue Act of 1928. A taxpayer which has chosen an accrual method of accounting must be allowed some latitude in the application of that method in accounting for its own particular business. The Board, like the courts, will not weigh to a nicety the relative merits of accounting systems. *Brown* v. *Helvering*, 291 U. S. 193. If a taxpayer has selected a method of accounting which clearly reflects

the income of its business, and if it regularly employs that method, there is no justification for either the taxpayer or the Commissioner departing from that method in the computation of income tax, even though the departure may have some slight tendency to reflect income more clearly. Had the record disclosed more completely the details of the accounting method employed by the mortgage company and the details of the various bond issues which it made, decision could have been reached on more satisfactory grounds. However, the case must be decided upon the record as made, and that record is sufficient to swing the scales slightly in the petitioner's favor.

The parties have stipulated that the mortgage company kept its books on an accrual basis. This must mean that it was regular and consistent in this respect. But we still do not know exactly how it treated the commissions on the sale of its bonds, that is whether it accrued them and charged them all against income of the year 1928 or whether it accrued them and charged them off over some longer or different period. The commissions on mortgage loans were accrued as income at the time the loans were made. Yet they were not reported as income on the return for 1928. It is difficult to tell, under such circumstances, exactly what the taxpayer's regular system of accounting was. However, we conclude from a consideration of the entire record that the mortgage company regularly accrued on its books the entire amount of commissions on the sale of its bonds at the time the bonds were sold and charged this item against income of that particular year, which income included the commissions accrued in that year on all mortgage loans made during the year. Such a method would clearly reflect the mortgage company's income for 1928 and the Commissioner had no right to depart from it in determining the deficiency. His action in adding the commissions accrued to income for 1928 was correct, because in that respect he adjusted the return to correspond with the bookkeeping method.

The principal business of the mortgage company in 1928 was to borrow money on its bonds at some expense to itself and promptly to lend that money out on mortgage loans at a profit. In a sense it was dealing in money as a commodity. This process of borrowing and lending was a continuous one. Most of the money loaned was obtained from the sale of bonds. The average life of the bonds was substantially equivalent to the life of the mortgages, and the interest rate on each was the same. The amount borrowed within each year was only slightly less than the amount loaned during that year. It can not be said that the mortgage company's bookkeeping method, in which both the commissions on bonds sold and the commissions on loans made were accrued as expense and income,

respectively, at the time of the particular transactions, fails clearly to reflect the income of its business for Federal income tax purposes. The two kinds of commissions were sufficiently closely related in this particular business during that year to justify similar treatment on the books of account. It is immaterial here that they might be properly accounted for in other ways. The mortgage company treated them in this particular way and the Commissioner had no right to change the method thus regularly employed.

*Bonded Mortgage Co. of Baltimore*, 27 B. T. A. 965, did not present quite as strong a case for the petitioner as this one. Furthermore, our decision in that case has been reversed. *Bonded Mortgage Co. of Baltimore* v. *Commissioner*, 70 Fed. (2d) 341. Although the court was influenced by much the same considerations which influence us here, it may have been unduly impressed with the necessity of treating both sides of the ledger in the same way. In the absence of close relationship between borrowings and lendings, as for example in the case where bonds having a life of 15 years were issued and the money thus obtained was loaned on mortgages having a life of 3 years, we would be unable to agree that there would be any inconsistency in spreading the cost of the bonds and at the same time taking into income of each year the entire amount of commissions on loans made during that year. But here the expenses of issuing the bonds in 1928 were deductible in that year in their entirety as an ordinary and necessary expense of the mortgage company's business under section 23 (a) of the Revenue Act of 1928.

> *Decision will be entered for the respondent in Docket No. 67804, and in the other three docket numbers decisions will be entered under Rule 50.*