ALLIED FIDELITY CORPORATION F.K.A. WILLIAM E. ROE, ALLIED AGENTS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8676-74.    Filed September 27, 1976.

---

*W. Rudolph Steckler,* for the petitioner.
*Thomas J. Meyer* and *William P. McKeithan,* for the respondent.

OPINION

TANNEWALD, *Judge:* Respondent determined the following deficiencies in corporate income taxes with respect to consolidated returns filed by petitioner:

| Year | Deficiency |
|------|-----------|
| 1971 | $26,900.86 |
| 1972 | 75,368.20 |

The issues for decision are:

(1) Whether Allied Fidelity Insurance Co. (hereinafter referred to as AFIC), a wholly owned subsidiary of petitioner, was an insurance company within the meaning of section 831[1] entitled to compute its income in the manner provided in section 832; and

(2) If AFIC is not taxable as an insurance company, whether its method of accounting clearly reflects income and was improperly disregarded by respondent.

All of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner is an Indiana corporation whose principal offices were located in Indianapolis, Ind., at the time its petition was filed. AFIC has been a wholly owned subsidiary of the petitioner since AFIC was incorporated on July 22, 1969.

Articles III and VII of the original articles of incorporation of AFIC stated its purpose and business plan as follows:

ARTICLE III

*Purposes of the Corporation*

*Section 1.* The Corporation is organized under the provisions of the Indiana Insurance Law of 1935, as amended (hereinafter referred to as the "Act"), for the purpose of writing the kind of insurance and reinsurance specified in subdivision (k) of Class II of Section 59 of the Act, namely:

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.

*Section 2.*

(k) To become surety or guarantor for any person, co-partnership or corporation in any position or place of trust or as custodian of money or property, public or private; to become a surety or guarantor for the performance by any person, co-partnership or corporation of any lawful obligation, undertaking, agreement or contract of any kind, except contracts or policies of insurance, to become surety or guarantor for the performance of insurance contracts where surety bonds are required by states or municipalities. The business covered by this subsection (k) shall be considered as fidelity and surety obligations and construed as such regardless of any other classification contained in this act to the contrary.

ARTICLE VII

*Business Plan*

The plan or principle on which the business of the Corporation shall be conducted is that of a stock company engaged in writing the kind of insurance and reinsurance specified in subdivision (k) of Class II of Section 59 of the Act.

On July 22, 1969, the Indiana Secretary of State certified the filing of AFIC's articles of incorporation under the State's insurance act. The articles were approved by the State insurance commissioner who, on September 2, 1969, issued a certificate of authority to AFIC to act as a surety or guarantor in accordance with its articles. This authority was continued by means of annual recertification at least through the years in issue. Pursuant to these certificates AFIC entered into surety and guaranty contracts in Indiana, including contracts of criminal bail. AFIC received authorization from the insurance regulatory bodies of other States to conduct one or more lines of business, including bail bonding, beginning with the indicated dates during or preceding the years in issue:

| State | Beginning date | State | Beginning date |
|---|---|---|---|
| Kentucky | 11/30/70 | Utah | 12/20/72 |
| Texas | 9/22/72 | New Mexico | 12/27/72 |

At the time this case was submitted, AFIC was authorized to do business in 29 States. Since July 1, 1970, AFIC has been authorized by the Treasury Department to qualify as sole surety in contracts of bail, recognizances, and other undertakings permitted or required by Federal law.

All of AFIC's bail bonding contracts were in substantially the following form:

ALLIED FIDELITY INSURANCE CO.

Indianapolis, Indiana

Appearance Bond

IN _____ COURT, STATE OF _____

STATE OF_____)

vs. _____)     COUNTY OF _____

_____)

Know All Men By These Presents:

That we, _____ as principal and ALLIED FIDELITY INSURANCE CO., as surety (Identified by attached Power of Attorney No. _____) are held and firmly bound unto the _____(court, city, county or state)_____ in the sum of _____ Dollars, for the payment whereof well and truly to be made we bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally firmly by these presents.

Signed and sealed this ___ day of _____, A.D. 19___.

The condition of this obligation is such that if the said _____, Principal, shall appear at the next Regular or Special term of the __(Name)__ Court ___(Location)___ to be held in and for said County to answer a charge of _____ and shall appear from day to day and term to term of said Court and not depart the same without leave than this obligation to be void, else to remain in full force and virtue.

Taken before and approved by me:)     _____(Seal)_____ (L.S.)

                                       ALLIED FIDELITY

_____)          INSURANCE CO.          (L.S.)

By _____)     _____Attorney-In-Fact_____     (L.S.)

This Bond Not Valid Unless Accompanied by an Individually Numbered Power of Attorney Properly Executed

On March 16, 1972, AFIC's articles of incorporation were amended to permit it to insure a wide variety of casualty and other risks. A certificate of authority covering these additional lines of business was issued by the Indiana Insurance Commissioner on May 1, 1972. AFIC subsequently obtained similarly expanded authority in other States. From that date on, AFIC engaged in writing motor vehicle insurance in addition to its surety and bail bonding activities.

Since its incorporation, AFIC has filed annual statements, on the form approved and adopted by the National Convention of Insurance Commissioners, with the insurance regulatory bodies of the States in which it is authorized to do business, as required by the laws of those States. AFIC's internal method of accounting and its method of accounting for tax purposes have been consistent with the methods used on the convention state-

ment and with generally accepted principles of accounting in accordance with accepted conditions or practices of insurance companies. Under those principles, AFIC did not include in the income reported on the consolidated returns amounts referred to as "unearned premiums," i.e., prepaid insurance or surety premiums [2] allocable pro rata to that portion of the contract term extending beyond the end of the taxable year in question.[3] Also in accordance with principles of insurance accounting, AFIC claimed a deduction in computing taxable income for amounts referred to herein as "unpaid net losses" and "unpaid loss adjustment expenses." "Unpaid net losses" consisted of claimed but unpaid estimated losses reduced by any portion thereof recoverable by contractual agreement, and/or estimates of such losses which had been incurred but not claimed by the end of the year. "Unpaid loss adjustment expenses" were estimates of unpaid expenses allocable to unpaid loss claims and estimated unreported losses. AFIC also included in its 1972 income dividends on stock of unrelated corporations in the amount of $874.75 which had been declared but not paid by the end of the taxable year.

AFIC's unearned premiums, unpaid net losses, and unpaid loss adjustment expenses were as follows for the years in issue:

| Line of business | Unearned premiums | | Unpaid net losses | | Unpaid loss adjustment expenses[1] |
|---|---|---|---|---|---|
| | 1971 | 1972 | 1971 | 1972 | 1972 |
| Surety—bail | --- | --- | $41,924.83 | $74,023.42 | --- |
| Automobile insurance | --- | $98,445.99 | --- | 6,300.88 | $985.60 |
| Fidelity and other surety | $12,908.93 | 25,530.86 | 554.92 | 4,948.32 | --- |
| Totals | 12,908.93 | 123,976.85 | 42,479.75 | 85,272.62 | 985.60 |

[1] No unpaid loss adjustment expenses were reported for 1971.

AFIC wrote net premiums allocable to its various lines of business in the following amounts before, during, and after the years in issue:

| | 1969 | 1970 | 1971 |
|---|---|---|---|
| Surety—bail | $34,075.41 | $189,800.66 | $255,463.65 |
| Automobile insurance | --- | --- | --- |
| Fidelity and other surety | --- | 15,538.50 | 26,156.80 |
| Totals | 34,075.41 | 205,339.16 | 281,620.45 |

[2] Any references herein to "insurance," "insurance premiums," or "premiums," or the use of similar phrases are for convenience only and are not to be accorded substantive significance unless the context so indicates.
[3] Amounts received as payment for bail bonds were treated by petitioner as being fully earned at the time of receipt, i.e., they were not prorated.

|  | 1972 | 1973 | 1974 |
|---|---|---|---|
| Surety—bail_____ | $280,446.01 | $455,680.04 | $555,603 |
| Automobile insurance _____ | 115,378.78 | 1,159,352.06 | 1,308,884 |
| Fidelity and other surety_____ | 44,836.12 | 96,790.24 | 110,440 |
| Totals _____ | 440,660.91 | 1,711,822.34 | 1,974,927 |

AFIC has engaged in no activity other than the above lines of business and the investment and reinvestment of its assets since its incorporation, and such activities produced all of its income during the years in issue.

Respondent determined that AFIC was not an insurance company during the years in issue. Accordingly, he contends that petitioner's taxable income was understated by the amount of AFIC's reserves for unearned premiums, unpaid net losses, and unpaid loss adjustment expenses, and overstated by the amount of declared but unpaid dividends reported.[4] Petitioner argues that AFIC was taxable as an insurance company, or if not that its accounting method nevertheless clearly reflected income.

We are provided with no helpful, freestanding definitions of the terms "insurance" and "insurance company" for Federal tax purposes. It is clear that our decision is not controlled by nontax classifications and that characterization of particular corporations depends not on labels or certificated powers but on the character of the business actually conducted and that, in the absence of other guides, we should presume Congress to have used words in their ordinary and commonly understood sense. *Haynes v. United States,* 353 U.S. 81 (1957); *Helvering v. LeGierse,* 312 U.S. 531 (1941); *Bowers v. Lawyers Mortgage Co.,* 285 U.S. 182 (1932); sec. 1.801-1(b), Income Tax Regs. Outside the tax field, definitions of "insurance" are as varied as the purposes for which they are sought. See, e.g., *S.E.C. v. Annuity Life Insurance Co.,* 359 U.S. 65 (1959); *Jordan v. Group Health Assn.,* 107 F.2d 239 (D.C. App. 1939); *Meyer v. Building & Realty Service Co.,* 209 Ind. 125, 196 N.E. 250, 100 A.L.R. 1442 (1935); Note, "An Analysis of 'Insurance' and 'Insurance Corporation,' " 36 Colum. L. Rev. 456 (1936). The parties apparently agree that AFIC was primarily engaged in the business of acting as surety

---

[4] For 1972, respondent increased petitioner's taxable income by the amount of the increase in the unearned premium and unpaid net loss accounts over the corresponding items at the close of 1971. For 1971, he included the entire closing balance of each account in income, disregarding opening balances of $9,435.57 and $6,400, respectively. If respondent is sustained in the position which he takes on the issues involved herein, this action also was proper. See sec. 481; *Hagen Advertising Displays, Inc.,* 47 T.C. 139 (1966), affd. 407 F.2d 1105 (6th Cir. 1969).

on bail bonds during the years in issue, and that it can be considered an insurance company only if the contracts made in the course of that business are insurance contracts. See *Columbia Title Insurance Co.,* 3 T.C. 1099 (1944).

In resolving this issue, we are unable to ascribe much significance to the fact that AFIC's bail bonding business was subject to regulation under the insurance laws of the various States in which it did business. Such regulation amounts to no more than a recognition that a corporate bail bondsman is ordinarily an insurance or surety company, not that bail bonding is insurance. Cf. *Louisville Title Co. v. Lucas,* 27 F.2d 413 (W.D. Ky. 1928). Professional bondsmen who are individuals frequently are not regulated under State insurance codes. *State v. Fishman,* 2 Conn. Cir. 83, 194 A.2d 725 (App. Div. 1963); *Portnoy v. McNamara,* 8 Ore. App. 115, 493 P.2d 63 (1972). Cf. *Sims v. Manson,* 25 Wis.2d 110, 130 N.W.2d 200 (1964).

In common understanding, an insurance contract is an agreement to protect the insured (or a third-party beneficiary) against a direct or indirect economic loss arising from a defined contingency. The insurer undertakes no present duty of performance but stands ready to assume the financial burden of any covered loss. 1 Couch, Insurance 2d, sec. 1:2 (1959). An essential feature of insurance is this assumption of another's risk of economic loss. 1 Couch, *supra,* sec. 1:3. By contrast, the principal obligation of the bail surety at common law was to produce the defendant at trial, an obligation for which the monetary bond was merely an assurance of, or inducement to, performance. *United States v. Ryder,* 110 U.S. 729, 734 (1884). Broad powers over the defendant's person were conferred upon the surety to aid in the performance of this duty, including the power to arrest. His undertaking thus resembled a contract to perform services—to stand in the jailer's shoes as custodian of the accused—rather than a contract of insurance. If the defendant failed to appear for trial, the surety's bond was forfeited, not to reimburse the State for the loss of the defendant's person but as a penalty for the surety's own failure to perform.

Petitioner points to language in some judicial opinions to support its contention that the foregoing model of the bail system is outdated. In *Leary v. United States,* 224 U.S. 567, 575-576 (1912), the Supreme Court stated:

The distinction between bail and suretyship is pretty nearly forgotten. The interest to produce the body of the principal in court is impersonal and wholly pecuniary. If * * * the bond was for $40,000, that sum was the measure of the interest on anybody's part, and it did not matter to the Government what person ultimately felt the loss so long as it had the obligation it was content to take. * * *

In a similar vein is *United States v. Davis,* 202 F.2d 621, 625 (7th Cir. 1953):

The bond is a contract between the surety and the government that if the latter will release the principal from custody the surety will undertake that the principal will appear personally at any specified time and place to answer. * * * When [the bondsman] writes a bond he assumes the great risk involved if his faith is misplaced in the person who executes the bond as principal. * * *

Petitioner argues that these cases envision a quite different role for the surety—that of simply guaranteeing payment of any forfeiture which might be incurred by reason of the defendant's nonappearance.

Petitioner's attempt to seize upon the foregoing language, obviously uttered in a nontax context, is of no avail. Most courts have not followed *Leary's* de-emphasis of the bondsman's personal obligation. Modern cases continue to assert that payment of the bond is not a substitute for performance of the surety's obligation to produce the defendant. *Continental Casualty Co. v. United States,* 314 U.S. 527 (1942); *Concord Casualty & Surety Co. v. United States,* 69 F.2d 78 (2d Cir. 1934); *United States v. Melville,* 309 F. Supp. 824 (S.D.N.Y. 1970). See also *United States v. Field,* 193 F.2d 92, 99 (2d Cir. 1951). The most that can be said is that the surety undertakes that the defendant will appear for trial or, alternatively, that the amount of the bond will be forfeited. *In re Lexington Surety & Indemnity Co.,* 272 N.Y. 210, 5 N.E.2d 204 (1936). The latter is subordinate and incidental to the former. Cf. *Bowers v. Lawyers Mortgage Co., supra.* The focus of the bail system remains on balancing the accused's interest in personal liberty against the giving of adequate assurance of his presence during the criminal proceedings (*Stack v. Boyle,* 342 U.S. 1 (1951)), not on protecting the Government against economic loss. Thus, the surety is still regarded as contracting principally to assume the Government's duty of supervising the defendant, rather than to compensate it for an economic loss. Although in form petitioner undertook to pay the amount of the bond if the defendant did not appear and

did not pay, substantively petitioner had a direct obligation and the risk to which it subjected itself was the risk of failure in its own duty; this is not a risk assumed from another, as in an insurance contract. In any event, even if we were to view the obligation as being that of the defendant himself with petitioner as being only contingently responsible, the further requirement that the risk involved be one of economic loss would still not be met.

In sum, AFIC's bail contracts were not insurance and AFIC was not an insurance company during the years in issue.[5]

We now turn to petitioner's alternative argument that, notwithstanding AFIC's failure to qualify as an insurance company, its method of accounting clearly reflected income and was improperly disregarded by respondent. Section 446 provides:

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

If petitioner's method of reporting clearly reflected AFIC's income, then respondent had no authority under this statute to require the use of a different method. On the other hand, if that method did not clearly reflect its income, respondent's adjustments will generally be sustained. *All-Steel Equipment, Inc. v. Commissioner*, 467 F.2d 1184 (7th Cir. 1972), affg. on this issue and revg. in part on other grounds 54 T.C. 1749 (1970). See also *Fort Howard Paper Co.*, 49 T.C. 275 (1967).

The gist of petitioner's argument is that, whatever the formal label applied to AFIC, its business was conducted and regulated as an insurance business and should be taxed as such.[6] However, sound commercial accounting is not necessarily the same as proper tax accounting (*American Automobile Assn. v. United*

---

[5] The parties have framed their arguments in generalities, and our opinion is shaped accordingly. Consequently, we need not and do not accord an unqualified blessing to the categorical position taken by respondent in Rev. Rul. 68-101, 1968-1 C.B. 319.

The record shows that the nature of AFIC's business was changing during the years in issue and afterward. Petitioner represents on brief that our decision herein will be determinative of AFIC's tax classification for subsequent years; however, we express no opinion on that issue.

[6] It is stipulated that petitioner's automobile insurance policies, to which some of the adjustments in question are attributable, are "contracts of insurance."

*States,* 367 U.S. 687 (1961); *Franklin Life Insurance Co. v. United States,* 399 F.2d 757 (7th Cir. 1968)) and the favored treatment accorded insurance companies by the Internal Revenue Code is not to be extended by analogy to others not qualifying as such. *Brown v. Helvering,* 291 U.S. 193 (1934). Cf. *Wayne Title & Trust Co.,* 16 T.C. 924 (1951), affd. 195 F.2d 401 (3d Cir. 1952). Nor does section 1.832-4(a)(2), Income Tax Regs., providing that "The underwriting and investment exhibit is presumed to reflect the true net income of the [insurance] company," permit AFIC to adopt wholesale the method of accounting specified in section 832. The "presumption" referred to is rooted entirely in and draws its sustenance from section 832, which we have held inapplicable to AFIC, and cannot successfully be transplanted or cultivated by petitioner. Cf. *Franklin Life Insurance Co. v. United States,* 399 F.2d at 760-761; *Hanover Insurance Co.,* 65 T.C. 715, 718 (1976). It remains to be determined whether the individual adjustments made by respondent were necessary to clearly reflect AFIC's income.

The first challenged item is AFIC's reserve for unearned premiums, none of which were attributable to AFIC's bail contracts. Amounts allocated to this account, and therefore excluded from income, represented premiums actually received with respect to insurance and fidelity and surety contracts but attributable to that portion of the contract term extending beyond the year in question. Although such premiums were allocated to a "reserve," they were subject to AFIC's unfettered control on receipt and were not impressed with any trust. Ordinarily they would have been considered income to a non-insurance company in the year of receipt. *American Automobile Assn. v. United States, supra; Wayne Title & Trust Co., supra.*

Petitioner relies heavily on *Artnell Co. v. Commissioner,* 400 F.2d 981 (7th Cir. 1968), in which the Seventh Circuit (to which appeal would lie herein) held that deferred reporting of receipts attributable to the taxpayer's promise to perform in a later year does not necessarily distort income where the time for such performance is definite and fixed. In contrast, it cannot be said that an obligation to pay any loss in respect of contracts covered by these unearned premiums was fixed either as to the existence of a liability or the time or amount to be paid. Thus, the situation does not fit within the *Artnell* rationale. Much more analogous are the situations of the taxpayers in *Schlude v.*

*Commissioner,* 372 U.S. 128 (1963), *American Automobile Assn. v. United States, supra,* and *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180 (1957), all of whom were required to report currently prepaid income allocable to indefinite future performance. Compare *Standard Television Tube Corp.,* 64 T.C. 238 (1975). Rev. Proc. 71-21, 1971-2 C.B. 549, is of no assistance to petitioner. By its own terms, it applies strictly to contracts to perform future services. An insurance or surety contract is a contract to pay money, not to perform services. Cf. *Standard Television Tube Corp., supra.* Petitioner may not exclude from AFIC's income any amount of unearned premiums.

Finally, we deal with AFIC's claimed deductions for unpaid net losses and unpaid loss adjustment expenses. These accounts reflected estimates of the company's liability on losses, which were claimed but unpaid or were incurred but not reported at the end of the taxable year, and of anticipated allocable expenses.

The parties have stipulated that "unpaid net loss" represents "a claimed but unpaid estimated loss less any portion thereof recoverable by contractual agreement and/or an estimate of such a loss which has not been claimed" and that "unpaid loss adjustment expenses" represent "estimates of unpaid allocated expenses attributable to unpaid loss claims and estimated unreported losses." Thus, the accounts in question include losses (claimed and unclaimed) and expenses related thereto as to which AFIC might contest the existence of a liability, as well as recognized losses as to which the amount of the loss might not be capable of being fixed with reasonable accuracy. Sec. 1.461-1(a)(2), Income Tax Regs. We have no evidence which would permit us to allocate *individual* items among the various categories of losses. Thus, *Crescent Wharf & Warehouse Co. v. Commissioner,* 518 F.2d 772 (9th Cir. 1975), revg. and remanding 59 T.C. 751 (1973), where only *uncontested* claims for workmen's compensation were involved, has no application.[7]

Petitioner misconceives the thrust of the cases it cites in support of these deductions, all of which allowed deduction of separately established liabilities, reasonably calculable in amount, and are consistent with the above-cited regulation. It has long been held that no deduction is allowable with respect to

---

[7] We note that the Ninth Circuit Court of Appeals remand was "for the purpose of determining whether the amounts of liability can be determined with reasonable accuracy." See 518 F.2d at 775.

estimated or contingent losses or expenses. *Brown v. Helvering, supra; World Airways, Inc.,* 62 T.C. 786 (1974), on appeal (9th Cir., May 20, 1975). This principle is applicable even where the liability provided for is in the nature of an insurance loss. *Milwaukee & Suburban Transport Corp. v. Commissioner,* 293 F.2d 628 (7th Cir. 1961), affg. per curiam T.C. Memo. 1959-216, on remand from 367 U.S. 906 (1961); *Spring Canyon Coal Co. v. Commissioner,* 43 F.2d 78 (10th Cir. 1930); *Wayne Title & Trust Co., supra.* Whether or not the method of accounting followed by AFIC would clearly reflect its income on the average or in the long run, see *Hanover Insurance Co., supra,* its income *for the taxable year* was not clearly reflected by the deduction of losses neither paid nor demonstrably incurred, any more than it was by the exclusion of receipts subject to the company's unrestricted control and not ascribable to a fixed obligation to perform at a date certain. See p. 1077 *supra.* Since AFIC was not an insurance company, it stands on an equal footing with and is subject to the same annual accounting principles as other taxpayers. The claimed deductions must be disallowed.

We do not understand petitioner to argue for the inclusion in income of declared but unpaid dividends except as required to be consistent with its other arguments, which we have rejected. In any event, under the rules applicable to noninsurance company, accrual basis taxpayers, such dividends are taxable only in the year in which they are unqualifiedly subject to the recipient's demand, which, at least in the absence of other evidence, is the year of receipt. *Dynamics Corp. of America,* 392 F.2d 241 (Ct. Cl. 1968); *Commissioner v. American Light & Traction Co.,* 156 F.2d 398 (7th Cir. 1946); *Frelbro Corp.,* 36 T.C. 864, 871-872 (1961), revd. on other issues 315 F.2d 784 (2d Cir. 1962).[8]

Respondent has conceded certain other adjustments in his determination. Accordingly,

*Decision will be entered under Rule 155.*

---

[8] See also *Bay Ridge Operating Co.,* T.C. Memo. 1970-19.