CUESTA TITLE GUARANTY COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7993–75    Filed November 22, 1978.

*Richard B. Dodge,* for the petitioner.
*Alan R. Herson,* for the respondent.

WILBUR, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax:

| Year | Deficiency |
|------|-----------|
| 1971 | $4,939 |
| 1972 | 9,035 |

The sole issue for decision is whether Cuesta Title Guaranty Co. (hereinafter petitioner) qualifies as an "insurance company" within the meaning of section 831.[1]

## FINDINGS OF FACT

Petitioner is a corporation organized and in good standing under the laws of California, with its principle office and place of business in San Luis Obispo, Calif. It prepared its Federal income tax returns (Forms 1120) for calendar years 1971 and 1972 on the accrual basis and under the provisions of section 831. These returns were filed with the Internal Revenue Service Center at Fresno, Calif.

Petitioner was incorporated in California on December 30, 1965, as Cuesta Title Guaranty Co. Article II of the original articles of incorporation states its purpose as including:

(a) Primarily to engage in the specific business of an underwritten title company.

(b) To engage in *the business of preparing* title searches, reports, opinions, title examinations, *certificates or abstracts of title upon which a title insurer will regularly issue policies of title insurance,* handle escrows of real property transactions in connection with which policies will regularly be issued. [Emphasis added.]

Twenty days after incorporation, by agreement dated January 19, 1966, petitioner entered into a contract entitled "Underwriting Agreement" with Chicago Title Insurance Co. (Chicago Title), a Missouri corporation which is qualified and licensed to conduct the business of title insurance in California, its principle place of business being Chicago, Ill. The agreement stated that it was entered into for the purpose of enabling petitioner to furnish title insurance service.

The underwriting agreement named Chicago Title as the "Insurance Company" and referred to petitioner as the "Underwritten Company." The agreement provided with regard to issuing insurance contracts that:

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

Insurance Company agrees that during the term of this agreement, it will cause to be issued through and upon request of Underwritten Company and to persons designated by Underwritten Company, policies of insurance insuring titles to real property located in San Luis Obispo County. Insurance Company reserves the right to prescribe the form of policy to be issued and to include in any policy such exceptions as it may deem appropriate or necessary.

The agreement spelled out the title examination procedures petitioner was required to perform prior to the issuance of a Chicago Title insurance policy:

prior to the issuance of any policy, Underwritten Company will have made, or caused to be made, a complete examination of the title, including an examination of all pertinent records of the state, county and city in which the land lies, as well as all tax records which might affect the title, all in accordance with the best title practice, and shall have prepared a written report showing the correct condition of the title and all defects to which it is subject.

    \*     \*     \*     \*     \*     \*     \*

Underwritten Company agrees to exercise the highest degree of care customary in the trade in the area in all of its work preliminary to and in the issuance of title policies hereunder and in the handling of escrows through which the same may be issued, and to comply with any and all instructions of Insurance Company with respect thereto. Underwritten Company grants to Insurance Company the right at any time to examine its title plant and records, including its escrow accounts, and agrees to promptly comply with any recommendations or suggestions of Insurance Company pertaining thereto unless compliance therewith is beyond its means.

One of the "recommendations" which petitioner agreed to follow stipulated Chicago Title's right to approve or disapprove the qualifications of any of petitioner's subsequently hired employees. In addition, the agreement provided that petitioner would keep a register of all "blank" policies given to petitioner by Chicago Title, and keep a separate file on each policy once it had been issued. However, no policy was valid until signed by a validating signatory designated by Chicago Title, and delivered to the insured. Additionally, no policy in excess of $100,000 (amended to $250,000 in 1974) could be issued without prior written approval of Chicago Title's president or vice president. Chicago Title also received the right of first refusal to purchase petitioner's business, title plant, and records in the event petitioner would desire to sell.

In case of termination of the agreement, it was provided that:

The respective obligations of the parties relating to liability for losses and incidental thereto shall survive any termination of this agreement, and

Underwritten Company hereby agrees that Insurance Company shall have the right to examine the books, records and papers of Underwritten Company in the event of any claim or notice of loss or possible loss, as Insurance Company may deem necessary, whether or not this agreement has been terminated.

Paragraph 12 of the agreement stated that petitioner would be liable to Chicago Title for:

Any loss suffered by an insured under any·policy of title insurance issued hereunder and which is insured against by such policy, if such loss or the liability of the Insurance Company to pay the same results from or is occasioned by:

(1) Any error or negligence of Underwritten Company if examining or reporting upon the title insured, or

(2) Failure of Underwritten Company to correctly report on the condition of the title as shown by the public records, * * *

Paragraph 12 then qualified this liability by excluding losses arising out of the construction placed upon the effect of any document or proceeding appearing of record or submitted to petitioner in support of any policy issued through its office.

In addition, in paragraph 12 petitioner agreed to have stipulated cash amounts available for reimbursing Chicago Title when petitioner's own negligence did result in a claim against Chicago Title:

It is understood and agreed that Underwritten Company will set aside a Ten Thousand Dollar ($10,000.00) cash reserve against losses as well as to secure the agreement to·complete a Five (5) year title plant within the time period which might be imposed on Insurance Company in connection with the Insurance Company becoming a member of the California Land Title Association. At no time will reserve be withdrawn wholly or partially without the written consent of Insurance Company. However, at such time as Underwritten Company has completed a C.L.T.A. inspected and qualifying title plant, Underwritten Company will be permitted on request to withdraw Seven Thousand Five Hundred Dollars ($7,500.00) from the reserve account. The balance of Twenty-Five Hundred Dollars ($2,500.00) will remain as a reserve against losses for the duration of this agreement plus Five (5) years after its termination.

The prescribed business routine provided that petitioner would charge and collect fees for the title examination and insurance policy, with Chicago Title furnishing petitioner with a fee schedule. The fee payments were divided as follows:

Of the fees so charged by Underwritten Company, *there shall be charged for the account of Insurance Company as its premium for the acceptance by it of the hazard involved in the insuring of the title and issuing its policy of title insurance,* the following: Ten percent (10%) of the gross title insurance

premium charged to customers on each policy of title insurance issued, subject to a minimum premium of Three Dollars ($3.00) per policy. * * *

*The balance* of the gross title fees charged to customers over and above the amounts defined as premiums * * * *shall be charged as compensation to Underwritten Company for its services to the insured in examining the title and preparing the report thereon,* and for such other services to the insured as may be included in the fee so charged. It is agreed that escrow fees collected by Underwritten Company and other income received by Underwritten Company, which are in payment for title insurance, are and shall remain the property of Underwritten Company.

[Emphasis added.]

The title insurance policies issued to customers pursuant to the underwriting agreement referred only to Chicago Title as the insurer, and explicitly provided that the amount charged to the customer included the total fee for title search, title examination, and title insurance.

In accordance with the terms of the underwriting agreement, petitioner applied for and on April 14, 1966, was granted a "License to Act as an Underwritten Title Company" by the insurance commissioner of the State of California Department of Insurance. Petitioner annually submitted reports to the California insurance commissioner, filing as an underwritten title company, and naming Chicago Title as its underwriter.[2]

On August 4, 1971, petitioner wrote to the California Department of Insurance, inquiring whether the California Insurance Code provisions which pertained to statutory reserve requirements of California insurance companies also applied to underwritten title companies.[3] On August 20, 1971, the Califor-

---

[2]Cal. Ins. Code sec. 12402 (West 1972), now Cal. Ins. Code sec. 12340.5 (West 1973), defines an "underwritten title company" as a company in the business of preparing title searches, title examinations, certificates or abstracts of title upon the basis of which a title insurer regularly writes title policies.

[3]The relevant statutes of the Cal. Ins. Code (West 1972) are as follows:

Sec. 12382.2 Amount to be set aside in unearned premium reserve commencing January 1, 1965

Out of total charges for policies of title insurance, *a title insurer shall* add to and set aside in its unearned premium reserve commencing as of January 1, 1965, an amount equal to two percent (2%) of such total charges for policies of title insurance, which amount shall be deemed and shall constitute the unearned premiums due or received from all such policies or contracts. * * *

Sec. 12382.5 Release from reserve and restoration to net profits; formula

The aggregate of the amounts set aside in unearned premium reserve in any calendar year pursuant to Section 12382.2 shall be released from said reserve and restored to net profits pursuant to the following formula: one-tenth (1/10th) of said aggregate sum on July 1, of each of the five (5) years next succeeding the year of addition to the reserve and one-thirtieth (1/30th) of said aggregate sum on July 1 of each succeeding year thereafter until the entire sum shall have been so released and restored to net profits. The aggregate of the amounts set aside in unearned premium reserve pursuant to Section 12382 shall be released from said reserve and restored to net profits and surplus

nia Department of Insurance replied that the provisions did not apply. They did state, however, that although not statutorily required, there was no objection to a company's making a provision for losses based on its past loss experience. Thus, beginning with 1971, petitioner retroactively set up "reserves for unearned premiums" and "reserves for unpaid losses," using the California Insurance Code's reserve provisions as a guide.[4]

Pursuant to California Insurance Code section 12382.2 (West 1972), petitioner set up reserves for unearned premiums for the following years in the amounts indicated:

| Year | Premium amounts | 2 percent |
|------|----------------:|----------:|
| 1966 | $13,938 | $279 |
| 1967 | 53,006 | 1,060 |
| 1968 | 62,869 | 1,257 |
| 1969 | 56,465 | 1,129 |
| 1970 | 73,727 | 1,475 |
| 1971 | 154,755 | 3,095 |
| 1972 | 174,241 | 3,485 |
| | $589,001 | $11,780 |

Pursuant to California Insurance Code section 12382.5 (West 1972), petitioner then returned to income in 1972 the following amounts:

---

pursuant to the foregoing formula, provided that said amounts so set aside shall be treated as if Section 12382 and this section had been effective during the calendar years 1962, 1963 and 1964.

Sec. 12388. Reserve for unpaid losses and loss adjustment expense; amount; calculation

*Every title insurer shall, in addition to other reserves establish and maintain a reserve to be known as the "reserve for unpaid losses and loss adjustment expense",* which shall be used for the payment of losses incurred as a result of liability arising under policies of title insurance and the payment of adjustment expenses necessary for the settlement of or defense against claims of any such liability. Said reserve shall be in an amount equal to the sum of (1) the estimated amounts necessary to pay unpaid losses, plus (2) the estimated amounts of loss adjustment expense necessary to settle or defend against every claim presented pursuant to notice from or on behalf of every insured that may result in a loss to or cause expense to be incurred by a title insurer for the proper disposition of the claim. *Every title insurer shall* calculate such reserve by making a careful estimate in each year of the amounts anticipated to be reasonably necessary for both such purposes. The sum of the items so estimated shall be the total amount of the reserve for unpaid losses and loss adjustment expenses of such title insurer. The amounts so estimated may be revised from time to time as circumstances warrant and reduced by the amount of payments made, but shall be redetermined at least once each year. The amounts set aside in such reserve in any year shall be deducted in determining the net profits for such period of any title insurer. [Emphasis added.]

[4]Although petitioner's brief repeatedly states that it "relied" upon the Cal. Ins. Code (West 1972), such reliance is not warranted since it had specifically been advised that it was not affected by those statutes.

| Year | Premium amounts | Factor | Amount |
|------|----------------|--------|--------|
| 1966 | | 0.01 | $138 |
| | $13,938 | .0003 | 5 |
| 1967 | 53,006 | .01 | 520 |
| 1968 | 62,869 | .008 | 503 |
| 1969 | 56,465 | .006 | 339 |
| 1970 | 73,727 | .004 | 295 |
| 1971 | 154,755 | .002 | 310 |
| 1972 | 174,241 | 0 | --- |
| | | | [1]2,110 |
| Per books and return | | | 2,079 |
| Error in computation in 1972 | | | 31 |

[1] The stipulation contains the total amount of $2,121 and $42 for the error in computation in 1972. The correct figures should read as above.

Pursuant to California Insurance Code section 12388 (West 1972), petitioner set up reserves for unpaid losses as follows:

| Year | Premium amounts | 10 percent |
|------|----------------|------------|
| 1966 | $13,938 | $1,393.80 |
| 1967 | 53,006 | 5,300.60 |
| 1968 | 62,869 | 6,286.90 |
| 1969 | 56,465 | 5,646.50 |
| 1970 | 73,727 | 7,372.70 |
| 1971 | 154,755 | 15,475.50 |
| 1972 | 174,241 | 17,215.00 |
| | | 58,691.00 |

In subsequently filing its Federal tax returns for 1971 and 1972, petitioner relied on section 831, specifically applicable to "insurance companies," and took deductions from gross income for its reserves for losses. These deductions totaled $40,860 for 1971 and $9,837 for 1972.

Respondent subsequently disallowed these deductions and assessed deficiencies of $4,939 for 1971 and $9,035 for 1972 on the grounds that petitioner was not an insurance company.

OPINION

The sole issue presented for decision is whether petitioner Cuesta Title Guaranty Co. qualifies as an insurance company within the meaning of section 831. In this regard, section 1.831–

1(a), Income Tax Regs., refers to section 1.801–1(b)(2), Income Tax Regs., which provides the following guidance:

> Though its name, charter powers, and subjection to State insurance laws are significant in determining the business which a corporation is authorized and intends to carry on, *the character of the business actually done* in the taxable year *determines whether it is taxable as an insurance company under the Code.* * * * [Sec. 1.801–1(b)(2), Income Tax Regs.; emphasis added.][5]

Petitioner asserts that "every single phase" of its business is "intimately allied" with the insurance business, emphasizing a number of factors including its charter powers, revenues, contracts, and "auxiliary" business activities such as escrow services and document preparation. Petitioner contends that these factors, along with its liability to Chicago Title for negligence under paragraph 12 of the underwriting agreement, show that the primary and predominant business activity of petitioner is the issuing of insurance contracts.

Respondent, on the other hand, relies upon the explanation of the term insurance company contained in section 1.801–1(b)(2), Income Tax Regs., recently clarified in *Allied Fidelity Corp. v. Commissioner*, 572 F.2d 1190 (7th Cir. 1978), affg. 66 T.C. 1068 (1976), cert. denied 439 U.S. 835 (1978). Respondent argues that the character of the business actually being done by petitioner is merely that of an underwritten title company. Respondent concedes that although a part of petitioner's business does consist of supplying title insurance contracts after having completed a title examination, nevertheless the *character* of the business is not "insurance" within the meaning of *Allied Fidelity Corp.* because Chicago Title, rather than petitioner, is assuming the insured's "risk of economic loss."

We agree with respondent. After closely studying both the underwriting agreement between petitioner and Chicago Title and the operation of petitioner's business, we are convinced that petitioner does not qualify as an insurance company within the meaning of section 831.

---

[5]"This * * * [regulation] is the cumulative result of a series of cases decided in the late 1920's and early 1930's. *Bowers v. Lawyers Mortgage Co.*, 285 U.S. 182 (1932); *United States v. Home Title Insurance Co.*, 285 U.S. 191 (1932); *United States v. Cambridge Loan & Building Co.*, 278 U.S. 55 (1928). In *Bowers*, the Supreme Court was faced with the similar question of whether the taxpayer there involved should be permitted to be taxed as an insurance company. The Court established as its test * * * [essentially the same] language which subsequently became incorporated into Treas. Regs., sec. 1.801–1(b). [*Allied Fidelity Corp. v. Commissioner*, 572 F.2d 1190, 1192 (7th Cir. 1978), affg. 66 T.C. 1068 (1976), cert. denied 439 U.S. 835 (1978). Fn. ref. omitted.]"

In *Allied Fidelity Corp.*, this Court (66 T.C. at 1073) made it clear that the character of the business actually done by the taxpayer corporation is the determinative factor of its tax status:

We are provided with no helpful, freestanding definitions of the terms "insurance" and "insurance company" for Federal tax purposes. It is clear that our decision is not controlled by nontax classifications and that characterization of particular corporations depends not on labels or certificated powers *but on the character of the business actually conducted* and that, in the absence of other guides, we should presume Congress to have used words in their ordinary and commonly understood sense. *Haynes v. United States*, 353 U.S. 81 (1957); *Helvering v. LeGierse*, 312 U.S. 531 (1941); *Bowers v. Lawyers Mortgage Co.*, 285 U.S. 182 (1932); sec. 1.801–1(b), Income Tax Regs. * * * [Petitioner] can be considered an insurance company *only if the contracts made in the course of* * * * [its] *business are insurance contracts.* * * * [*Allied Fidelity Corp. v. Commissioner*, 66 T.C. 1068, 1073–1074 (1976); emphasis added.]

In affirming this Court's decision in *Allied Fidelity Corp.*, the Seventh Circuit referred to the definition of insurance as provided by Couch on Insurance:

the common definition for insurance is an agreement to protect the insured against a direct or indirect economic loss arising from a defined contingency whereby *the insurer* undertakes no present duty of performance but *stands ready to assume the financial burden of any covered loss.* 1 Couch on Insurance 2d sec. 1:2 (1959). * * *

* * * * * * *

As the tax court below noted, an insurance contract contemplates a specified insurable hazard or risk with one party willing, in exchange for the payment of premiums, to agree to sustain economic loss resulting from the occurrence of the risk specified and, another party with an "insurable interest" in the insurable risk. *It is important here to note that one of the essential features of insurance is this assumption of another's risk of economic loss.* 1 Couch on Insurance 2d sec. 1:3 (1959). [*Allied Fidelity Corp. v. Commissioner*, 572 F.2d 1190, 1193 (7th Cir. 1978); emphasis added.]

Petitioner attempts to distinguish *Allied Fidelity Corp.* on its facts, stating that the Seventh Circuit merely found that the character of the company's business was that of acting as surety on bail bonds. Pointing out that the court held that bail bonds were not insurance, petitioner argues that the policies it issues are indeed insurance contracts. We note, however, that both this Court and the Seventh Circuit in *Allied Fidelity Corp.* found that the failure of Allied Fidelity to bear another's risk of economic loss was dispositive.

Although petitioner insists it bears the risk of economic loss

under the contracts issued, this assertion conflicts with its underwriting agreement with Chicago Title. Petitioner points to paragraph 12 as proof of the risk of loss it assumes, but its contractual liability under this paragraph is limited solely to its own negligence, and runs only to Chicago Title. Although the record includes testimony that customers come directly to petitioner when they have a claim, this mechanical business practice cannot be deemed significant in light of the legal obligations of Chicago Title as expressed in the underwriting agreement and in the insurance policies.[6] The issue does not turn on the mechanics of claim presentations, but on who bears the risk of economic loss. Under the insurance contracts before us, the risk of economic loss falls on Chicago Title.

Petitioner cites several cases in which title *insurance* companies have been classified as insurance companies under section 831.[7] It fails, however, to cite any case which found an *underwritten* title company to come within that section. In the cases involving title insurance companies, there was no disagreement that the taxpayer company was doing *some* amount of "insurance business," i.e., "assuming another's risk of economic loss." The issue in these cases was whether such activity constituted the taxpayer's "principle" business activity, and by what means that uncertain standard should be determined. The issue at hand, however, which is the first hurdle petitioner must surmount, is qualitative—whether petitioner is doing any "insurance" business at all. The second hurdle is quantitative— whether insurance is the company's "principle" activity. In attempting to meet the second hurdle by skirting the first, petitioner fails both.

Petitioner minimizes the distinction between underwritten title companies and title insurance companies. Its vice president,

---

[6]The heading and signature of the customer's title insurance policy plainly bears the name of Chicago Title Insurance Co. The name of petitioner company is nowhere mentioned in the body of the contract, and only appears in the lower left-hand corner of the first page. The next-to-last paragraph of the policy requests that any correspondence be sent to Chicago Title, and provides that address.

[7]It is well settled that in guaranteeing land titles for a consideration, a company is in the insurance business, and when this business constitutes its *principle* business, it is taxable as an insurance company. 8 J. Mertens, Law of Federal Income Taxation, sec. 44.05, ch. 44, p. 15 (1970). Petitioner cites *United States v. Home Title Insurance Co.*, 285 U.S. 191 (1932); *Dallas Title & Guaranty Co. v. Commissioner*, 40 B.T.A. 1022 (1939); *Title & Trust Co. v. Commissioner*, 15 T.C. 510 (1950); *United States v. Fidelity & Deposit Co. of Maryland*, 177 F.2d 805 (4th Cir. 1949); and Rev. Rul. 71–404, 1971–2 C.B. 260, and attempts to analogize these to petitioner's "insurance" business. In all of these cases, however, it was understood that there was some amount of insurance business actually being conducted by the title insurer.

in attempting to explain away the distinction between the two types of businesses, testified: "mainly the only difference between our company and a title insurance company, as such, is we do not issue our own policies. We write the policies of our underwriter which, in this case, is Chicago Title." It is this difference, however, that is critical, for it demonstrates the fundamental distinction between the two types of companies. As this Court has stated in *Allied Fidelity Corp. v. Commissioner*, *supra* at 1077: "the favored treatment accorded insurance companies by the Internal Revenue Code is not to be extended by analogy to others not qualifying as such."

Alternatively, petitioner tries to prove its need for reserves by pointing out the negligence provisions in paragraph 12 and the "risks" there assumed. However, petitioner there had merely warranted that its employees would do professional work, according to the standards provided by the California Land Title Association, being held, as it were, to the prescribed standard of care for the title examination industry.

Nevertheless, petitioner argues that because its "risks" are growing as it writes more and more policies in greater dollar amounts, it will not be able to meet a "catastrophic loss" should it occur. We assume petitioner means by this that it would not have the funds to repay Chicago Title if an extraordinarily large claim were based on its negligence.

First, it is noted that errors and omission insurance for title examining companies is available, and petitioner has a policy of limited coverage at present.[8] Second, and more importantly, even though it is not an insurance company, it may, like any other business, plan for future losses by establishing reserves. As Justice Brandeis stated in *Brown v. Helvering*, 291 U.S. 193, 201–202 (1934): "The simple answer is that * * * [plaintiff] is not an insurance company; and that the deductions allowed for additions to the reserves of insurance companies are technical in character and are specifically provided for in the Revenue Acts. * * * *Many reserves set up by prudent business men are not*

---

[8] In its coverage thereunder, petitioner is not "reinsuring" itself as an insurance company could do. Black's Law Dictionary (4th ed. 1951), defines "reinsurance" as "a contract by which an insurer procures a third person to insure him against loss or liability [incurred] by reason of original insurance. A contract that one insurer makes with another *to protect the latter from a risk already assumed.*" (Emphasis added.) See also *Franklin Title & Trust Co. v. Commissioner*, 32 B.T.A. 266, 268 (1935). Petitioner's errors and omission insurance does not seem significantly different from an attorney's or doctor's malpractice insurance.

*allowable as deductions.* [Emphasis added.]" Cf. *Lucas v. American Code Co.*, 280 U.S. 445 (1930).

Finally, petitioner refers to the California Insurance Code sections regulating insurance companies (see n. 3 *supra*). The short answer to this is that petitioner, not bearing the economic risk of loss on the insurance contracts issued, is not required to establish reserves pursuant to these provisions. The letter from the California Department of Insurance states this with unmistakable clarity.[9]

The only control which the State of California has exercised over the petitioner has been its regulations of petitioner's title examination activities. Chicago Title, however, is registered with the State of California as an insurance company, generally, and as petitioner's underwriter, specifically. This is the company to whom California and its citizens look for the guarantee of customers' claims.[10]

Congress acknowledged the financial obligations which insurance companies undertake by legislating unique tax provisions for them. The tax treatment of the insurance industry is based on the premise that the premiums paid for insurance policies are not entirely "gross income" to an insurance company, as it will pay out substantial sums each year in meeting claims based on these policies. Accordingly, reserves for losses are indispensable to the insurer's financial stability, and to the customer's continuing faith in the insurance industry.

We find that because petitioner is not undertaking any contractual liability for the title insurance policy claims, it is not "assuming| anothers risk of economic loss," as |required by *Allied Fidelity Corp. v. Commissioner*, 572 F.2d 1190, 1193 (7th Cir. 1978). Lacking this characteristic of contractual liability, petitioner cannot come within the meaning of "insurance company" for purposes of section 831.

*Decision will be entered for the respondent.*

---

[9]See Note, "The Title Insurance Industry and Governmental Regulation," 53 Va. L. Rev. 1523, 1527 (1967). See also 8 J. Mertens, Law of Federal Income Taxation, sec. 44.04, p. 11 (1970).

[10]In 1965, Chicago Title was the nation's second largest title insurer. *United States v. Chicago Title & Trust Co.*, 242 F. Supp. 56 (N.D. Ill. 1965).