RAYMOND C. PARISEAU and CAROL PARISEAU, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pariseau v. Commissioner
Docket No. 15951-82.
United States Tax Court
T.C. Memo 1985-124; 1985 Tax Ct. Memo LEXIS 508; 49 T.C.M. (CCH) 984; T.C.M. (RIA) 85124; March 21, 1985. Joel D. Brostein, *510 Sharon E. Selk, and B. Gray Gibbs, for the petitioners. J. Michael Melvin, for the respondent. SCOTT
MEMORANDUM OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax for the years and in the amounts as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
1974
$28,401
$14,200
1975
28,656
14,328
1976
50,082
25,041
The issues for decision are (1) whether petitioners' sole proprietorship, C & R Insurance Fund, qualified as an insurance company during the years 1974, 1975 and 1976 and if so, does this fact entitle it to apply corporate rates to determine its tax liability for such years and to deductions for such years for unearned premiums and losses incurred; (2) whether any part of the underpayment of taxes for any of the years in issue was due to fraud under section 6653(b); and (3) whether the statute of limitations bars the assessment and collection of any deficiency for the years in issue. *511 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Raymond C. Pariseau (petitioner) and Carol Pariseau, husband and wife, who resided in St. Petersburg, Florida, at the time of filing of their petition in this case, filed joint Federal income tax returns for the taxable years 1974, 1975 and 1976. For the years in issue, petitioners used the cash basis method of accounting. During the taxable years 1974, 1975 and 1976, petitioners owned and operated two corporations, Suncoast Rent-A-Car, Inc. (Suncoast) and Way-Lo Rent-A-Car, Inc. (Way-Lo) which were both engaged in the car rental business in the St. Petersburg-Treasure Island area of Florida. Way-Lo was a wholly owned subsidiary of Suncoast. Mr. and Mrs. Pariseau were president and vice president, respectively, of both Suncoast and Way-Lo. Petitioners owned all the stock of Suncoast. Suncoast and Way-Lo both operated on a fisal year ending September 30 and filed corporate tax returns for fiscal years ending September 30, 1974, 1975 and 1976. From 1966 to 1973, Suncoast and Way-Lo acquired liability, collision and comprehensive insurance coverage for their car rental fleets from large independent *512 insurance companies. The collision insurance coverage acquired during this time provided for a $250 deductible for each claim. Petitioners established a sole proprietorship doing business as C & R Insurance Fund (C & R) in 1972 to purchase from other companies collision, comprehensive and liability insurance for the car rental operations of Suncoast and Way-Lo. Initially C & R acquired this insurance from either Al Block (Block Insurance) in Miami or Fred Page (Fast Insurance Agency) in Fort Lauderdale. The collision insurance obtained by C. & R had a $250 deductible for each claim. In 1972 petitioner noticed that in most cases the damage to any automobiles owned by the corporations was under $250. As a result petitioner decided to cease purchasing collision insurance from independent insurance companies and decided instead to retain a part of the premium income received from Suncoast and Way-Lo and to perform all repairs and maintenance on the automobiles himself through his sole proprietorship C & R. Accordingly, in 1973 and continuing through 1976, the premiums charged by C & R to Suncoast and Way-Lo included amounts for collision insurance, but petitioner no longer obtained *513 collision insurance for these companies from Block Insurance or Fast Insurance Agency. All collision damage was thereafter covered by C & R. During the tax years in issue, petitioner acquired liability coverage for Suncoast and Way-Lo from independent insurance companies. From July 1, 1975, to July 1, 1976, C & R acquired liability insurance from Rental Industry Services for automobiles operated by Suncoast. At no time did C & R apply to the State of Florida for a license to act as an insurance agent nor did petitioner apply for a certificate of authority to conduct business as an insurance company. On June 30, 1976, Suncoast received from the Florida Department of Insurance a self-insurer certificate which required proof that Suncoast possessed an unencumbered net worth of at least $40,000. [2] The self-insurance certificate was canceled on February 20, 1978. Beginning sometime in 1973, petitioner made oral arrangements with his two brothers for C & R to provide insurance coverage for the cars owned and operated by their rental car businesses. The arrangements were similar to those petitioner had made with Suncoast and *514 Way-Lo. Petitioner's two brothers are Earl Pariseau and Godfrey Pariseau. Earl Pariseau owned a car rental company in Miami doing business as Way-Lo Rent-A-Car, Inc. (Way-Lo-Miami) which was formed in 1974. From July 1, 1974, to June 30, 1975, Earl Pariseau acquired insurance from Block Insurance. From July 1, 1975, to June 30, 1976, C & R obtained liability insurance coverage for automobiles owned by Way-Lo-Miami from Rental Industry Services. Way-Lo-Miami had the same arrangement for repair of collision damage to its cars by C & R as did Suncoast and Way-Lo. After June 30, 1976, C & R ceased providing insurance services for Way-Lo-Miami. At that time, Earl Pariseau obtained a Florida self-insurer certificate [3] and he was self-insured for about 3 years. Petitioner's brother, Godfrey Pariseau, owned two car rental companies in Orlando, Florida, doing business as Suncoast Rent-A-Car, Inc. (Suncoast-Orlando) and Way-Lo Rent-A-Car, Inc. (Way-Lo-Orlando). Godfrey Pariseau formed Suncoast-Orlando in 1972 and Way-Lo-Orlando in 1974. Initially he acquired collision, liability and comprehensive insurance for the companies from *515 Block Insurance and Fast Insurance Agency. Due to insurance rate increases, Godfrey Pariseau obtained insurance coverage through C & R beginning sometime in 1973. He continued his arrangement with C & R until 1976 at which time he sold his businesses. Initially C & R acquired insurance for Godfrey Pariseau's companies from Chicago Insurance. From July 1, 1975, to July 1, 1976, C & R acquired liability insurance from Rental Industry Services for automobiles operated by Suncoast-Orlando. Suncoast-Orlando and Way-Lo-Orlando did business as one corporation and operated out of one location. Petitioners had no interest in Way-Lo-Miami, Suncoast-Orlando or Way-Lo-Orlando. C & R entered into the insurance arrangements with petitioner's brothers in order to obtain a better rate for liability insurance since lower rates were available for a larger combined volume of risks. For the insurance services provided, C & R charged Suncoast and Way-Lo, as well as the corporations owned by petitioner's two brothers, amounts which petitioner informed his brothers were based on monthly car rental revenues. At the end of each month the applicable premium for that month was calculated and a check *516 was written to C & R to cover the insurance costs. These checks were deposited in C & R's checking account at the First Bank of Treasure Island, generally during the following month. No written contracts setting frorth the details of coverage and the amounts to be charged were entered into by the parties. For the period from August 1975 through June 1976, the insurance premiums received by C & R from Suncoast-Orlando, Way-Lo-Orlando and Way-Lo-Miami were as follows: Suncoast-Orlando and
Way-Lo-Orlando
Way-Lo-Miami
August 1975
$648.96 (9-9-75)
$867.29 (9-23-75)
September 1975
408.00 (10-28-75)
624.58 (10-13-75)
October 1975
358.62 (11-11-75)
731.84 (11-11-75)
November 1975
446.29 (12-9-75)
713.83 (12-9-75)
December 1975
506.31 (1-9-76)
116.09 (1-26-76)
957.87 (1-9-76)
January 1976
882.42 (2-17-76)
1,067.39 (2-17-76)
February 1976
964.92 (3-16-76)
1,239.74 (3-9-76)
March 1976
600.74 (4-12-76)
809.43 (4-12-76)
78.63 (4-20-76)
163.44 (4-20-76)
April 1976
793.05 (5-13-76)
821.55 (5-11-76)
May 1976
684.12 (6-9-76)
579.12 (6-9-76)
June 1976
For the period from *517 August 1975 through June 1976, the total amounts used by C & R to purchase liability coverage from Rental Industry Services for Suncoast-Orlando, Way-Lo-Orlano and Way-Lo-Miami were as follows: Suncoast-Orlando and
Way-Lo-Orlando
Way-Lo-Miami
August 1975
$648.96
$867.29
September 1975
438.00
624.58
October 1975
458.62
731.84
November 1975
440.42
713.83
December 1975
623.40
957.87
January 1976
882.42
1,067.39
February 1976
964.92
1,239.74
March 1976
679.37
972.87
April 1976
793.05
821.55
May 1976
684.12
579.12
June 1976
605.24
579.12
During 1974, 1975 and 1976, in addition to premium income derived from its insurance services, C & R also had receipts from (1) customers who either reimbursed C & R for repairs directly or had their insurance companies reimburse C & R for damage to rental vehicles; (2) other insurance companies that insured vehicles involved in accidents with vehicles insured by C & R; (3) car sales; and (4) loan transactions with Godfrey Pariseau and other miscellaneous sources. C & R did not maintain a formal set of books and records during the tax years 1974, 1975 and 1976. The only records which were maintained *518 by C & R were monthly bank statements, deposit slips and canceled checks from a checking account at First Bank of Treasure Island, Treasure Island, Florida. C & R had no checking account other than the account at First Bank of Treasure Island. C & R had no savings account nor did it own certificates of deposit in its own name. The bank records of C & R reveal that the sole proprietorship had gross receipts from the following sources in the following amounts for tax years 1974, 1975 and 1976: 1974
1975
1976
Insurance premiums [4]
$57,272.44
$ 81,013.25
$115,252.77
Repairs - reimbursement
2,247.87
8,435.58
6,369.58
Sales of autos
18,950.00
26,732.10
27,690.85
Loan transactions
604.65
Rebate-American Motors
9,925.00
Other Miscellaneous
Income
378.56
TOTAL
$88,395.31
$116,785.58
$149,691.76
The bank records *519 of C & R reveal that the sole proprietiorship had business expenses in the following amounts for tax years 1974, 1975 and 1976: 1974
1975
1976
Insurance premiums
$16,260.42
$21,478.41
$27,034.68
Repairs
6,154.91
9,876.74
9,081.80
Purchase of autos
19,399.98
26,023.35
25,726.21
Commissions
1,866.00
TOTAL
$41,815.31
$59,244.50
$61,842.69
On Schedule C of their 1974, 1975, and 1976 Federal income tax returns, petitioners reported gross receipts for C & R in the respective amounts of $53,492, $71,771 and $81,304. From these amounts petitioners deducted the respective amounts for cost of goods sold and/or operations of $50,978, $70,530 and $80,157, leaving a net profit in the respective amounts of $2,514, $1,241 and $1,147 to be reported as business income on their 1974, 1975 and 1976 tax returns. Funds in C & R's bank account were used for petitioner's personal expenditures such as ski trips, doctor bills, construction of mountain chalets and to establish bank accounts and trusts for petitioner's wife and daughter. These personal expenditures totaled $39,021.78 for 1974, $51,897.52 for 1975, and $77,116.42 for 1976. During the entire *520 period of its existence, the only records C & R maintained consisted of monthly bank statements, deposit slips and canceled checks for a checking account at First Bank of Treasure Island, Florida. For a number of years prior to 1972, a certified public accountant (C.P.A.) had handled all the accounting work for petitioner's corporations. This accountant had also prepared the corporate tax returns and prepared petitioner's personal income tax returns for the years 1972 through 1978. The accountant prepared a Schedule C for petitioner's 1972 tax return, reporting the income and deductions and net income of C & R. For the year 1972, this accountant computed the gross receipts of C & R by an addition of all the deposits into the C & R checking account and, to arrive at income, deducted therefrom expenses determined by reference to the check stubs of the C & R bank account. C & R's income was reported on the cash receipts and disbursements method of accounting. After some discussion with one of the accountants employed by the C.P.A. who handled the accounting work of the corporations and did petitioner's tax returns, petitioner concluded that he could save some money by computing *521 the gross receipts and expenses of C & R himself and furnishing the information to the accountant to be used in the preparation of the Schedule C which would be included in his personal income tax return. The C.P.A. gave petitioner a format to be used for summarizing the transactions to be reported on Schedule C. This format called for stating the beginning cash balance in the checking account, the ending cash balance in that account, total receipts of C & R to be determined from bank deposits, and business expenses to be determined from the check stubs of checks written on the bank account. An accountant in the C.P.A.'s office explained to petitioner that it was relatively simply to add up the total deposits and to add up the total checks drawn for C & R's expenses. For the calendar year 1974, petitioner furnished to the C.P.A. a sheet of paper, purporting to comply with the format and instructions, which shows the following: Cash Balance January 1, 1974
$3,421.00
Cash Balance December 31, 1974
5,934.00
Receipts--Insurance
53,492.33
Total Disbursements
50,978.91
The correct gross receipts figure for C & R in 1974 as determined from deposits into its *522 checking account was $88,395.31, and the correct cost and expenses determined from check stubs were $41,815.31. The correct beginning cash balance on January 1, 1974, was $2,138.06 and the correct ending cash balance on December 31, 1974, was $14,663.48. For the calendar year 1975, petitioner furnished the C.P.A. with the following figures, purporting to be in accordance with the format and instructions: Cash Balance January 1, 1975
$13,198.10
Cash Balance December 31, 1975
14,438.53
Total Deposits
71,770.70
Insurance Expenses
48,821.10
Repair Expenses
21,709.17
The correct beginning cash balance as shown in C & R's check book in 1975 was $14,668.48, and the correct ending cash balance was $14,438.53.Total deposits were $116,785.58, correct insurance expenses were $21,478.41, and correct repair expenses were $9,876.74. For the calendar year 1976, the summary sheet prepared by petitioner showed the following figures: Total Deposits
$81,303.51
Repair Expenses
38,406.00
Insurance Expenses
41,751.22
The correct gross receipts figure for 1976 was $149,691.76, the correct insurance expenses were $27,034.68, and the correct repair *523 expenses were $9,081.80. Petitioner did not advise his C.P.A. that he had income deposited in C & R's account from sources other than insurance services. The C.P.A. prepared the Schedule C for C & R which was included in petitioner's Federal income tax returns for each of the years 1974, 1975 and 1976, using the cash receipts and disbursements method of accounting and the figures supplied to him by petitioner. Petitioner never advised his C.P.A. that the figures he gave to him for total deposits or gross receipts did not include the total amounts deposited to C & R's account or that there were not checks written covering the total amounts which he furnished the C.P.A. as insurance expenses and repair expenses. The following schedule shows petitioner's correct income for each of the years 1974, 1975 and 1976 from the sources indicated: 1974
1975
1976
Wages
$ 34,000.00
$ 50,250.00
$ 26,000.00
Interest/Dividends
8,153.00
14,921.00
20,918.00
Rental Income
14,700.00
14,700.00
14,700.00
Schedule C
Auto Sales
18,950.00
26,732.10
27,690.85
Loans
604.65
Rebate/Miscellaneous
income
9,925.00
378.56
Repairs
reimbursements
2,247.87
8,435.58
6,369.58
Insurance Activity
57,272.44
81,013.25
115,252.77
Total
$145,248.31
$196,656.58
$211,309.76
*524 Agents of respondent commenced an audit of petitioner's 1974, 1975 and 1976 returns in the spring of 1977. They called on petitioner's C.P.A., who represented petitioner during this audit. The C.P.A., during the course of this investigation, asked petitioner to turn his bank records over to him and was told by petitioner that those records had been water-damaged. The C.P.A. told petitioner that the water damage would not present a problem since copies of the records could be obtained from the bank. After receiving this information, petitioner turned the records over to his C.P.A. undamaged. The C.P.A. prepared amended returns, correctly reporting receipts and expenses of C & R. The C.P.A. asked petitioner for an explanation of the large amounts of unreported deposits, and the only explanation which petitioner offered was that he could not have made such an error. During the entire course of the civil audit of petitioner's tax returns for 1974, 1975 and 1976, petitioner's only explanation for his understatement of C & R's gross receipts and his failure to include in the figures he gave to the accountant all the bank deposits into the C & R account, was that it was an error. *525 After the conclusion of the civil audit, a criminal investigation of petitioner's taxable years 1974, 1975 and 1976 was commenced. During the course of this investigation the bank records of C & R were examined and an analysis of the bank statements was prepared for the years 1972 through 1976. Petitioner went through his bank records with the investigating agent and identified the source of each deposit and placed each expenditure in a category such as repair expenses, insurance expenses, other business expenses or personal expenses. The following schedule shows the gross receipts of C & R for each of the years 1974, 1975 and 1976, indicating the source of the receipts: 1974
1975
1976
Insurance
$57,272.44
$ 81,013.25
$115,252.77
Repairs-Reimbursement
2,247.87
8,435.58
6,369.58
Sales of Autos
18,950.00
26,732.10
27,690.85
Loan Transactions
604.65
Rebate--American Motors
9,925.00
Other Miscellaneous
Income
378.56
Total
$88,395.31
$116,785.58
$149,691.76
The bank deposit analysis of business expenses of C & R for the years 1974, 1975 and 1976 shows the following: 1974
1975
1976
Insurance Expenses
$16,260.42
$21,478.41
$27,034.68
Repairs
6,154.91
9,876.74
9,081.80
Purchase of Autos
19,399.98
26,023.35
25,726.21
Commissions
1,866.00
Total
$41,815.31
$59,244.50
$61,842.69
*526 At the initial interview of petitioner during the criminal investigation the agents questioned him as to his method of computing the gross receipts which he furnished to his C.P.A. to be used in computing the income of C & R. Petitioner stated that he had added all the deposits into the bank account of C & R to arrive at gross receipts, specifically stating that he had added all the deposits to obtain gross receipts. When petitioner was asked in this interview for an explanation why the total deposits were so much larger than the amount he had furnished to his C.P.A. as C & R's total deposits or gross receipts, his only explanation was "It is stupidity on my part." While the criminal investigation was in progress, the C.P.A. prepared petitioner's 1977 tax return and included in the gross receipts of C & R all gross receipts as computed from bank deposits. Petitioner never offered an explanation either to his own C.P.A. or to respondent's agent for his omission of large portions of the gross receipts of C & R from income, other than error, until he obtained the services of a lawyer in connection with the criminal investigation. Thereafter petitioner, for the first time, attempted *527 to explain the omitted gross receipts by stating that the omitted receipts were intended as a reserve account to cover future losses. No reserve account of any type was set up on petitioner's books or set aside in any special account. The criminal investigation of petitioner resulted in an indictment of petitioner for tax evasion under section 7201 for each of the years 1974, 1975 and 1976. The specific action alleged to be evasion of taxes under section 7201 was the omission of income from Schedule C of petitioner's Federal income tax returns for 1974, 1975 and 1976. Petitioner entered a plea of not guilty to the charges set forth in the indictment and the case was tried before a jury. At the end of the trial, petitioner's defense attorney asked for and received a lesser-included offense jury instruction. Under this instruction, the jury was to consider whether petitioner was guilty of violating section 7207 of the Internal Revenue Code by filing a false return. On October 9, 1981, after a trial on the merits, a jury in the Middle District of Florida found that petitioner was not guilty of violating the provisions of section 7201 but was guilty of *528 filing a false return under section 7207 for each of the years 1974, 1975 and 1976. United States v. Pariseau, Docket No. 81-33-Cr-t-H, United States District Court for the Middle District of Florida. In his notice of deficiency issued to petitioners, respondent increased the gross receipts of C & R by the amounts he determined to have been omitted and by the amounts he determined expenses had been overstated and determined an addition to tax of fraud under section 6653(b). Respondent determined that no part of the underpayment of tax was due to fraud on the part of Carol Pariseau and that no part of the addition to tax for fraud was applicable to her. OPINION Issue 1. Existence of Insurance Company.
The first issue for decision is whether petitioners' sole proprietorship, C & R, is an insurance company within the meaning of section 831. We are not provided with statutory definitions of the terms "insurance" and "insurance company" for Federal tax purposes. The regulations, however, provide the following definition of "insurance company": Insurance company. (1) The *529 term "insurance company" means a company whose primary and predominant business activity during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. Thus, though its name, charter powers, and subjection to State insurance laws are significant in determining the business which a company is authorized and intends to carry on, it is the character of the business actually done in the taxable year which determines whether a company is taxable as an insurance company under the Internal Revenue Code. [Section 1.801-3(a)(1), Income Tax Regs.] [Emphasis added.] The Supreme Court, in Helvering v. Le Gierse,312 U.S. 531, 539 (1941), stated that "Historically and commonly insurance involves risk-shifting and risk-distributing." A main principle of insurance is the requirement that one with a risk of economic loss shifts that risk to an insurer who undertakes to cover any loss sustained in exchange for a premium which is the method by which the insurer distributes the risk of loss to a number of insureds exposed to similar risks. See Vance, Insurance *530 4-5 (3d ed. 1951). The primary requisite essential to a contract of insurance is the assumption of a risk of loss and the undertaking to indemnify the insured against such loss. It is characteristic of insurance that a number of risks are accepted, some of which will involve losses, and that such losses are spread over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it. * * * [Footnotes omitted] [1 Couch, Insurance 2d, sec. 1:3, pp.6-7 (1984).] Petitioner takes the position that his sole proprietorship, C & R, was doing business as an "insurance company" and pursuant to section 831 was entitled to compute its tax liability according to the corporate tax rates provided in section 11. Petitioner concludes that the "character of the business actually done" by C & R was providing insurance coverage and therefore C & R was taxable as an "insurance company" under the Code. Allied Fidelity Corp. v. Commissioner,66 T.C. 1068, 1073-1074 (1976), affd. 572 F.2d 1190 (7th Cir. 1978), cert. denied 439 U.S. 835 (1978). [5]
*531 Petitioner takes the position that C & R received insurance premiums from five separate corporations: Suncoast, Way-Lo, Suncoast-Orlando, Way-Lo-Orlando, and Suncoast-Miami. Although Suncoast and Way-Lo were wholly owned by petitioner, he argues that he had no interest in the three remaining corporations that paid insurance premiums at a rate which was based on a percentage of gross receipts derived from car rentals. Petitioner concedes that there was no written agreement between C & R and the corporations it claims to have insured. Petitioner argues, however, that there was an oral agreement between C & R and each of these corporations under which C & R directly underwrote the collision insurance on the automobiles owned by the corporations. Petitioner contends that by June 1976, C & R began underwriting the liability coverage for the five corporations. Recognizing that "risk-shifting" and "risk-distributing" are requirements for a contract to be an insurance contract, petitioner argues that the requisite risk-shifting and risk-distributing existed to render C & R an insurance company. Petitioner distinguishes Carnation Co. v. Commissioner,71 T.C. 400 (1978), *532 affd. 640 F.2d 1010 (9th Cir. 1981), cert. denied 454 U.S. 965 (1981), by arguing that unlike the situation in Carnation,C & R had no agreements which effectively negated or neutralized the risk that had been contractually shifted from the five car rental corporations to C & R by means of the oral insurance agreements. Respondent argues that petitioner's failure to qualify C & R as an insurance company pursuant to Florida law [6] rendered C & R unable to conduct business as an insurance company for Federal tax purposes. Although C & R's "name, charter powers, and subjection to State insurance laws", are significant in determining whether C & R is an insurance company as provided in section 1.801-3(a)(1), Income Tax Regs., we focus our attention on "the character of the business actually" conducted by C & R and determine whether C & R's "primary and predominant business activity" was issuing insurance contracts. Bowers v. Lawyers Mortgage Co.,285 U.S. 182 (1932); Allied Fidelity Corp. v. Commissioner,66 T.C. at 1073; Cuesta Title Guaranty Co. v. Commissioner,71 T.C. 278, 286 (1978), *533 affd. per order (9th Cir. Jan. 29, 1981); section 1.801-3(a)(1), Income Tax Regs. Even though petitioner's sole proprietorship, C & R, fails to qualify as an insurance company pursuant to Florida law, an insurance company may exist for Federal income tax purposes if the requisite risk-shifting and risk-distributing were present in 1974, 1975 and 1976 between C & R and petitioner's wholly owned corporations and between C & R and petitioner's brothers' companies. See Helvering v. Le Gierse,312 U.S. 531, 539-540 (1941). *534 Respondent argues that petitioner fails to qualify as an insurance company because C & R's primary and predominant business activity is not issuing insurance contracts. Respondent notes that petitioner's tax returns for the years in issue reveal his significant involvement in numerous other income-producing activities as follows: (1) corporate officer of Suncoast drawing annual salaries; (2) investor earning dividends and interest; (3) landlord collecting rental income; and (4) sole proprietor of C & R deriving income from auto sales, loans, and auto "insurance income. In respondent's view the risk-shifting test cannot be met in the instant case because petitioner owns Way-Lo, Suncoast and C & R, and any loss sustained by Way-Lo or Suncoast would ultimately be borne by petitioner. Stearns-Roger Corp. v. United States,577 F. Supp. 833 (D. Colo. 1984). Respondent argues that the amounts which Way-Lo and Suncoast paid to C & R were thus in the nature of a fund for self-insurance. In respondent's view, petitioner primarily collected a premium which he used to purchase insurance coverage from a third party and was thus an insurance agent rather than an insurance *535 company. Respondent supports this agency argument by pointing out that monthly premiums which Earl Pariseau paid to petitioner from July 1, 1975, to June 30, 1976, were identical to the amounts petitioner used to purchase liability insurance for this brother's company during this period except for 2 months when the amounts petitioner received were less than the amounts he spent to purchase insurance coverage. Therefore, respondent argues that no portion of the amount received from Earl Pariseau can be attributed to a premium for collision coverage during this period. Respondent also compares the payments received from August 1975 through June 1976 from Godfrey Pariseau with the amounts petitioner spent during this period to purchase liability coverage for this brother's companies. These amounts were identical except for 4 months when the amounts petitioner received were less than the amounts he spent to purchase liability insurance. Therefore, respondent concludes that no portion of the payments C & R received from Godfrey Pariseau was used for collision coverage on the automobiles owned by Godfrey Pariseau's companies. Since no premiums for collision insurance were paid by Earl *536 and Godfrey Pariseau after July 1975, respondent concludes that petitioner took no steps to spread or distribute the risk of loss by charging premiums for any collision insurance coverage. Respondent relies on Carnation Co. v. Commissioner,71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), cert. denied 454 U.S. 965 (1981), to support his view that the requisite risk-shifting did not exist between C & R and petitioner's wholly owned corporations because petitioner owned both C & R and the insureds. Petitioner takes the view that under the holding in Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943), even though C & R was a sole proprietorship, it constituted a separate entity which had been created for the legitimate business purpose of providing insurance. Petitioner argues that C & R's activities were not limited to insuring only its own companies as articulated in Rev. Rul. 77-316, 1977-2 C.B. 53, and in Stearns-Roger Corp. v. United States,supra, because C & R assumed the risk of loss for the three companies that were owned by Earl and Godfrey Pariseau. *537 In Carnation Co. v. Commissioner,supra, we held that premium payments made to a wholly owned subsidiary were not deductible by the parent corporation because the insurance agreements failed to shift the insurance risk. In Carnation, a corporate parent, Carnation Co., established a wholly owned Bermuda subsidiary, Three Flowers Assurance Co., to insure and provide reinsurance for Carnation and its other subsidiaries. Carnation capitalized Three Flowers with $120,000 and the two companies agreed that Carnation, upon demand, would purchase up to $2,888,000 more of the subsidiary's stock. Then Carnation purchased a $500,000 per loss policy with an independent insurance company, American Home Assurance Co., which immediately reinsured 90 percent of its risk with Three Flowers and ceded to Three Flowers 90 percent of the premium received from Carnation. As a result of this reinsurance contract, American Home was liable to Carnation under the insurance policy but Three Flowers was required to reimburse American Home under the terms of their reinsurance contract. The agreement between Three Flowers and Carnation for an additional $2,888,000 in capital upon *538 demand was the result of American Home's concern that Three Flowers was insufficiently funded to meet the reinsurance risks undertaken. Carnation paid a $1,950,000 premium to American Home and shortly thereafter American Home paid Three Flowers $1,755,000 pursuant to their reinsurance contract. Carnation deducted the full $1,950,000 premium paid to American Home as an ordinary and necessary business expense on its tax return. We relied on Helvering v. Le Gierse,supra, for our holding that no true insurance existed between Carnation and Three Flowers to the extent that Carnation's risk was reinsured with Three Flowers. In Le Gierse, an elderly woman was advised that certain amounts designated as insurance were not subject to estate tax. At age 80, less than 1 month before her death, she attempted to buy a $25,000 life insurance policy for a premium of $22,946. The insurer would not sell the policy unless the woman also purchased an annuity at a cost of $4,179. She purchased both contracts at a total cost of $27,125. When the woman died, the issue arose whether the $25,000 death benefit could be excluded from her estate as insurance. The Supreme Court *539 held that it could not, because the annuity and insurance contracts, considered together, "wholly fail[ed] to spell out any element of insurance risk," 312 U.S. at 541. The Court found the existence of none of the "risk-shifting and risk-distributing * * * essential to a life insurance contract." 312 U.S. at 539. The Court reasoned that the annuity neutralized the risk customarily inherent in a life insurance contract. 312 U.S. at 541. In Carnation, we concluded that the reinsurance agreement between American Home and Three Flowers and Carnation's agreement to capitalize Three Flowers up to $3 million on demand were interdependent and offset each other in the same manner that the insurance and annuity contracts did in Le Gierse. 71 T.C. at 409. The Ninth Circuit, in affirming Carnation, found that no actual insurance risk existed in Carnation because any insurance risk was neutralized to the extent American Home reinsured with Three Flowers. 640 F.2d at 1013. The Circuit Court concluded that the deductions were not allowable because the requisite economic shifting or distributing of the risk *540 of loss was not present where the alleged insureds were all economically interrelated and the risks were carried or retained by a foreign subsidiary which was wholly owned by one of the alleged insureds. We conclude that here, as in the Carnation case, no economic risk was shifted from petitioner's corporations to C & R with respect to collision damage to the corporation's automobiles. [7]C & R was a sole proprietorship and therefore any loss it sustained was petitioner's loss. Suncoast and Way-Lo were wholly owned by petitioner and although they were corporate entities separate from petitioner, economically any loss they sustained was petitioner's loss. In this case the economic risk of collision damage to the automobiles owned by Suncoast and Way-Lo would ultimately be borne by petitioner and the payments which Suncoast and Way-Lo made to C & R do not constitute insurance permiums insofar as they purported to relate to collision insurance. *541 The testimony in this case is that C & R provided collision insurance coverage for Earl Pariseau's car rental company, Way-Lo-Miami, from July 1, 1975, to June 30, 1976. C & R collected "premiums" from Way-Lo-Miami for liability coverage and used the premiums to purchase liability coverage from Rental Industry Services. The record reflects that in 1975 and 1976 C & R received insurance receipts from Way-Lo-Miami in the respective amounts of $2,937.54 and $5,638.54. These total amounts were used to purchase liability insurance from Rental Industry Services. C & R collected insurance premiums from Godfrey Pariseau's car rental companies, Suncoast-Orlando and Way-Lo-Orlando, from 1973 or 1974 through 1976. The total amounts collected from July 1, 1975, through June 30, 1976, were used to purchase liability coverage from Rental Industry Services. In 1974, 1975, and 1976, C & R received insurance receipts from Suncoast-Orlando and Way-Lo-Orlando in the respective amounts of $11,958.48, $7,749.79, and $4,626.28. The record reveals that the amounts C & R received for insurance premiums from Suncoast-Orlando, Way-Lo-Orlando and Way-Lo-Miami were approximately the amounts C & R spent *542 to purchase liability coverage for those companies from Rental Industry Services. This leaves nothing remaining from the amount C & R received from these companies for petitioner to use to cover collision insurance. Although the testimony is not clear as to the arrangement between C & R and the companies owned by petitioner's brothers as to collision insurance, the record is absolutely clear that the total "premiums" paid by those companies to C & R were used by C & R to purchase liability insurance for those companies. Therefore we conclude from the facts established in this record that whatever the agreement between C & R and petitioner's brothers' companies with respect to collision insurance, C & R received no amount even designated as a "premium" for whatever it did in connection with the automobiles of these companies damaged in collisions. Therefore, no insurance "premiums" were received by C & R for collision insurance coverage on automobiles of the companies owned by petitioner's brothers. We conclude, based on this record, that C & R's activities did not constitute those of an insurance company with respect to the "insurance premiums" received from August 1975 through *543 June 1976 from Suncoast-Orlando, Way-Lo-Orlando and Way-Lo-Miami because (1) C & R expended approximately the amount received to purchase liability insurance from a third party, and (2) there were no amounts paid by these companies for collision coverage allegedly furnished by C & R. Although the record does not contain the figures for the year 1974 and for January to August 1975 from which a similar comparison can be made, the clear indication is that the arrangements between C & R and petitioner's brothers' companies were the same for all the years C & R had an agreement with them. Based on this record, we hold that C & R's principal business activity was not providing insurance coverage, Cuesta Title Guaranty Co. v. Commissioner,71 T.C. 278, 287 (1978), affd. per order (9th Cir. Jan. 29, 1981), and that C & R's "primary and predominant business activity" was not issuing insurance contracts. Section 1.801-3(a)(1), Income Tax Regs.
Issue 2. Claimed Deduction of Unearned Premium and Losses Incurred.
In order for a business entity to *544 qualify as an insurance company taxable under section 832(a), it must be primarily engaged in the business of issuing insurance contracts. Section 1.801-3(a)(1), Income Tax Regs.[8]
Since we have found that C & R was not an insurance company, it does not meet the requirement of being engaged primarily in issuing insurance contracts and therefore is not entitled to the claimed deductions for unearned premium reserves and unpaid losses. "[T]he favored treatment accorded insurance companies by the Internal Revenue Code is not to be extended by analogy to others not qualifying as such." Allied Fidelity Corp.,supra at 1077, 1079. Issue 3. Additions to Tax.
Section 6653(b) provides: (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * The burden of proving fraud is on respondent, and he must do so by clear and convincing *545 evidence. Rule 142(b); section 7454(a); Stone v. Commissioner,56 T.C. 213, 220 (1971). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent collection of taxes and that there is an underpayment of tax. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Acker v. Commissioner,26 T.C. 107, 112 (1956). When fraud is asserted, as in the instant case, for more than one taxable year, respondent must show that some part of an underpayment was due to fraud for each taxable year in order for the corresponding addition to tax to be upheld. Professional Services v. Commissioner,79 T.C. 888, 930 (1982); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner,supra at 1123; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), *546 affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). We have considered the evidence in this case in light of the principles of law discussed above with respect to fraud and have concluded that respondent has shown by clear and convincing evidence that some portion of petitioner's underpayment of tax in each of the years 1974, 1975 and 1976 was due to fraud. The record here is clear that petitioner omitted from his tax return in each of these years substantial amounts of income and substantially overstated his deductions. While omission of income alone is not sufficient to establish a fraudulent intent, the continued omission of substantial amounts of income over a period of several years is some evidence of fraud. Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970). Whether the omission of income or the overstatement of deductions was done by a taxpayer with an intent to evade tax, can seldom, if ever, be established by direct proof. However, such an *547 intent to evade may be inferred from actions by a taxpayer which are designed to conceal the omitted income or the fact that deductions were overstated, conduct which is misleading as to the taxpayer's income, or any other action which indicates the intent to evade tax a taxpayer owes or believes he owes. In judging a taxpayer's actions, consideration must be given to the intelligence and business acumen of the taxpayer in determining whether the omission of income or overstatement of deductions might have been inadvertent. Although petitioner in this case argued that he was not a knowledgeable, well-educated man and did not understand bookkeeping, we conclude from his demeanor on the witness stand an the knowledge displayed in answering questions that although his formal education was limited to completing the ninth grade and some years spent in a trade school, petitioner was a knowledgeable businessman who understood what constituted income. Petitioner, himself, in his testimony stated that he was told to compute gross receipts by adding up all deposits to C & R's bank account and to compute deductions by adding up disbursements as shown by the check stubs of that benk account *548 which recorded checks that had been drawn for business expenses. In spite of petitioner's protestations of his lack of bookkeeping knowledge, it was clear from his answers to questions as a witness and his general demeanor on the witness stand that he did understand how to compute gross receipts by addition of all deposits to C & R's bank account and how to compute total expenses. In fact, it was petitioner that assisted the agents in analyzing deposits and checks drawn on the account. This cooperation with respondent's agents might mitigate in petitioner's favor except for the fact that it was not forthcoming until petitioner was made aware that respondent could obtain the information from the bank if he did not cooperate. When petitioner was first confronted with the discrepancy in the income received by C & R and the figures petitioner furnished his accountant to use in computing C & R's income, petitioner's only explanation was that he did not see how he could have made such a mistake or maybe it was just his stupidity. Later, petitioner changed his explanation to an explanation that he thought he needed to save portions of his income because some day he might have large insurance *549 losses. From observing petitioner testifying in this respect, we conclude that in fact petitioner never thought about establishing may reserve for losses when he did not furnish to his accountant the proper amount of gross receipts of C & R. We conclude from the evidence that this thought first occurred to petitioner when it was suggested to him by an attorney that perhaps C & R, as an insurance company, would be entitled to deduct certain reserves for anticipated losses. Our conclusion in this regard is reinforced by the fact that for the 2 years in which petitioner furnished the opening and closing balances in the C & R account to his C.P.A., the difference in these two figures was exactly the same as the difference in the deposits and expenses which he furnished to the C.P.A. Had petitioner correctly furnished the figures requested by the C.P.A. and all checks written on C & R's account been for business expenses, the difference in the correct opening and closing balances and the total deposits and total disbursements from the account would have been the same. It is clear therefore that petitioner did understand the figures he should have furnished the C.P.A. well enough to *550 furnish incorrect figures which would not alert the C.P.A. to the fact that the figures were incorrect. It stretches credulity too far to be asked to believe that any inadvertent omission would have produced such a result in two separate years. In the years here in issue, C & R purchased liability insurance from an independent insurance company. Therefore, the maximum limit of liability which C & R would be obligated to sustain was the cost of repair of an automobile damaged in a collision where the obligation for such repair was not paid by another party or the other party's insurance company. The vague references petitioner made to possible large losses all dealt with the personal liability area, and this risk for both of petitioner's corporations and his brothers' corporations was carried by an independent insurance company. We do not accept petitioner's explanations of his reasons for not reporting large portions of C & R's income and for overstating C & R's costs and expenses. The fact that petitioner gave several attempted inconsistent explanations of his omission of income and his overstatement of expenses is further evidence that he intended to evade income tax on the *551 omitted income. Petitioner clearly attempted inconsistent explanations of his reasons for omitting income and overstating costs. His explanations at the trial and on brief were his lack of expertise in bookkeeping and the fact that he was establishing a reserve against future losses. To us, the two explanations are inconsistent since knowledge of establishing reserves would imply knowledge with respect to bookkeeping. The explanation by petitioner of lack of knowledge with respect to bookkeeping is totally unpersuasive since mere addition of deposits into C & R's account is no complicated form of bookkeeping. Petitioner have even been given a format to use to list the total deposits to C & R's account, and from his testimony it is clear that he understood that all deposits were to be listed and he had the capability of listing all deposits. [9]
*552 Other actions of petitioner are clearly indicative that his omissions from income in each of the years here in issue and his understatement of expenses were actions done with intent to evade tax. The record shows that petitioner took approximately the amount of omitted receipts from C & R's bank account in each year for use for personal purposes, such as building a chalet and establishing trusts for his wife and daughter. As petitioner points out, since C & R was a sole proprietorship there was no impropriety in petitioner's using funds in C & R's account for personal purposes. However, where the record is clear that petitioner knowingly omitted these amounts from income reported on his return and attempted to explain such omission by a claim that it was a reserve for losses, the usage made of the omitted income for totally unbusiness-related items does indicate that petitioner was intending to evade tax on the income and was attempting to conceal this evasion. The usage made of the funds omitted from income further reinforces what is otherwise clear in the record that petitioner, at the time he failed to report substantial amounts of gross receipts and understated the expenses *553 of C & R's business, had no thought in mind of establishing any form of reserve against future losses. There are other discrepancies in this record which reinforce our conclusion that a part of the underpayment of tax in each year here involved was due to fraud. There is much testimony with respect to C & R's receiving a premium for supplying colision insurance to the corporations owned by petitioner's brothers. However, the record is clear that all "premiums" paid by the corporations owned by petitioner's brothers to C & R were used by C & R to purchase liability insurance for those companies. Whatever may have been the arrangement between C & R and the corporations owned by petitioner's brothers with respect to collision insurance, the record is clear that it was not an arrangement whereby C & R received a premium for insuring the cars against damage by collision. It may be, as was inferred by some of the witnesses, that C & R did some repair work on automobiles belonging to the companies owned by petitioner's brothers. If this is a fact, the record does not show whether C & R was paid by these companies on the basis of the work done or what the actual arrangement was. The *554 record is also clear that the amounts advanced to C & R by petitioner's corporations were greatly in excess of the cost of liability insurance for those corporations. There is nothing in this record to clearly show whether the difference would be a reasonable payment for collision insurance, but the inference from all the testimony, particularly the testimony that most of the damage that happened to the automobiles owned by petitioner's corporations was in each instance less than $250, is that the "premiums" paid by petitioner's companies in excess of those needed to purchase liability insurance, were far greater than a standard payment for collision insurance. There is a reasonable inference to be drawn from this fact that effectively petitioner was transferring funds from his corporations to C & R and using the funds transferred for his personal use without reporting the amount as income of C & R, and that the amount transferred had little, if any, relationship to the value of C & R's repair of vehicles which were damaged in collisions. Considering the evidence here as a whole, we conclude that respondent has shown by clear and convincing evidence that a part of the underpayment *555 of tax for each of the years here involved was due to fraud by petitioner with intent to evade tax. Issue 4. Statute of Limitations.
Under the false return exception to the general 3-year statute of limitations, the Commissioner may assess a deficiency at any time if the taxpayer filed a false or fraudulent return with intent to evade tax. Section 6501(c)(1); section 301.6501(c)-1(a), Proced. & Admin. Regs. As with any exception to section 6501(a), the Commimssioner bears the burden of pleading and proving that the exception is applicable. Bonwit Teller & Co. v. Commissioner,10 B.T.A. 1300 (1928); Farmers Feed co. v. Commissioner,10 B.T.A. 1069 (1928). Respondent's burden of proof under section 6501(c)(1) is the same as that which respondent bears under section 6653(b). Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 232 (3d Cir. 1967), revg. on other grounds 46 T.C. 622 (1966); Botwinik Brothers of Mass., Inc. v. Commissioner,39 T.C. 988, 996 (1963). Respondent's position is that under *556 section 6501(c)(1) there is no statute of limitations barring assessment of the deficiencies determined because petitioner's understatements of income were due to fraud. For the same reasons we concluded that a part of petitioner's underpayment of tax in each of the years here in issue was due to fraud with intent to evade tax within the the meaning of section 6653(b), we conclude that petitioner's returns for each of these years was false or fraudulent with intent to evade tax and that under section 6501(a) the assessment and collection of deficiencies for these years is not barred by the statute of limitations. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. See Fla. Stat. Ann. sec. 324.171↩ (West 1984).
3. See Fla. Stat. Ann. sec. 324.171↩ (West 1984).
4. The following amounts represent insurance premiums received by C & R from Suncoast-Orlando, Way-Lo-Orlando and Way-Lo-Miami: ↩
1974
1975
1976
Suncoast-Orlando
and Way-Lo Orlando
$11,958.48
$ 7,749.79
$ 4,626.28
Way-Lo-Miami
2,937.54
5,638.54
TOTAL
$11,958.48
$10,687.33
$10,264.82
5. While we do not accept petitioner's contention that C & R, a sole proprietorship, whould be taxable at the corporate rates provided for in section 11 if we concluded it was an insurance company, because of our holding that C & R was not an insurance company, we do not reach the former issue.↩
6. The Florida statute provides as follows: 624.401. Certificate of authority required (1) No person shall act as an insurer, and no insurer or its agents, attorneys, subscribers, or representatives shall directly or indirectly transact insurance, in this state except as authorized by a subsisting certificate of authority issued to the insurer by the department, except as to such transactions as are expressly otherwise provided for in this code. (2) No insurer shall from offices or by personnel or facilities located in this state solicit insurance applications or otherwise transact insurance in another state or country unless it holds a subsisting certificate of authority issued to it by the department authorizing it to transact the same kind or kinds of insurance in this state. * * * Fla. Stat. Ann. sec. 624.401 (West 1984). In addition, respondent notes that petitioner's operation of C & R as a sole proprietorship precluded him from being eligible to obtain a certificate of authority to transact insurance business in Florida due to C & R's failure to qualify as an "incorporated stock insurer, an incorporated mutual insurer, or a reciprocal insurer" as required pursuant to Fla. Stat. Ann. sec. 624.404 (West 1984). A reciprocal insurer in Florida is an unincorporated aggregation of 25 or more people domiciled in the state to provide reciprocal insurance among themselves. Fla. Stat. Ann. secs. 629.021, 629.081(1)↩ (West 1984).
7. See also Beech Aircraft Corp. v. United States, an unreported case ( D.Kan. 1984, 54 AFTR 2d 6173, 84-2 USTC par. 9803). In Beech Aircraft, a manufacturer and seller of aircraft and replacement parts capitalized an insurance company in Bermuda with not more than $150,000 in order to provide product liability insurance of several million dollars. Beech Aircraft deducted the insurance premiums paid to the insurance company as an ordinary and necessary business expense.The court denied the deductions because in its view the subsidiary insurance company was inadequately capitalized and any loss sustained by the insurance company would ultimately be paid by Beech Aircraft. The court concluded that the risk-shifting was only a paper transfer. But see Crawford Fitting Co. v. United States, an unreported case ( N.D. Ohio 1985,     AFTR2d    , 85-1↩ USTC par. 9189) in which the court allowed a corporation to claim deductions for insurance premiums paid to a captive insurance company where the court concluded that the wholly owned captive insurance company and the parent were separately incorporated entities and that the wholly owned captive insurance company was formed for a legitimate business purpose and was not formed for purposes of tax avoidance or evasion.
8. See Rev. Rul. 83-132, 1983-2 C.B. 270↩.
9. The parties argue at some length the extent to which petitioner is estopped because of his conviction under sec. 7207 from denying that he knew his return for each of the years 1974, 1975 and 1976 to be fraudulent or false as to a material matter. Sec. 7207 provides in pertinent part: SEC. 7207. FRAUDULENT RETURNS, STATEMENTS, OR OTHER DOCUMENTS. Any person who willfully delivers or discloses to the Secretary or his delegate any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $1,000, or imprisoned not more than 1 year, or both. * * * The Supreme Court, in Sansone v. United States,380 U.S. 343, 352-353 (1965), stated: Section 7207 requires the willful filing of a document known to be false or fraudulent in any material manner. The elements here involved are willfulness and the commission of the prohibited act. Section 7207 does not, however, require that the act be done as an attempt to evade or defeat taxes. Conduct could therefore violate section 7207 without violating section 7201 where the false statement, though material, does not constitute an attempt to evade or defeat taxation because it does not have the requisite effect of reducing the stated tax liability. This may be the case, for example, where a taxpayer understates his gross receipts and he offsets this by also understating his deductible expenses. In this example, if the Government in a section 7201 case charged tax evasion on the grounds that the defendant had understated his tax by understating his gross receipts, and the defendant contended that this was not so, as the misstatement of gross receipts had been offset by an understatement of deductible expenses, the defendant would be entitled to a lesser-included offense charge based on section 7207, there being this relevant disputed issue of fact. This would be so, for in such a case, if the jury believed that an understatement of deductible expenses had offset the understatement of gross receipts, while the defendant would have violated section 7207 by willfully making a material false and fraudulent statement on his return, he would not have violated section 7201 as there would not have been the requisite section 7201 element of a tax deficiency. Here, however, there is no dispute that petitioner's material misstatement resulted in a tax deficiency. Thus there is no disputed issue of fact concerning the existence of an element required for conviction of section 7201 but not required for conviction of section 7207. Given petitioner's material misstatement which resulted in a tax deficiency, if, as the jury obviously found, petitioner's act was willful in the sense that he knew that he should have reported more income than he did for the year 1957, he was guilty of violating both sections 7201 and 7207. If his action was not willful, he was guilty of violating neither. As was true with section 7203, on the facts of this case sections 7201 and 7207 "covered precisely the same ground," Berra v. United States, supra, at 134, 76 S. Ct. at 688, and thus petitioner was not entitled to a lesser-included offense charge based on section 7207. [Emphasis added.] To what extent the ultimate fact required for petitioner's conviction under section 7207, that he willfully filed a return known by him to be fraudulent or false in any material matter, would apply as estoppel in the instant case we need not decide since in our view the evidence produced at the trial of this case, independent of any collateral estoppel, is clear and convincing that petitioner filed a fraudulent return with intent to evade tax in each of the years here in issue. Certainly petitioner's conviction under section 7207 can be weighed with all the other evidence of record in determining whether any part of petitioner's underpayment of tax in each of the years here in issue was due to fraud with intent to evade tax. See Gemma v. Commissioner,46 T.C. 821, 834 (1966), in which we held, in considering whether a taxpayer was liable for an addition to tax for fraud under section 6653(b)↩, that the taxpayer was estopped by entry of a plea of guilty to a charge of willful failure to file an income tax return for the year involved to deny that his failure to file a return for that year was willful.